[No. B097966. Second Dist., Div. One. July 1, 1997.]

ROSALVA SADA, Plaintiff and Appellant, v.
ROBERT F. KENNEDY MEDICAL CENTER, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts C through E.

## COUNSEL

Chad Batzkovich for Plaintiff and Appellant.

Rushfeldt, Shelley & Drake, Linda C. Miller and Christine T. Hoeffner for Defendant and Respondent.

## OPINION

**MASTERSON, J.**—Plaintiff Rosalva Sada, a registered nurse, worked on a temporary basis at defendant Robert F. Kennedy Medical Center (Medical Center) as an independent contractor. When the Medical Center had openings for full-time employees on the nursing staff, Sada submitted an application and was interviewed. The Medical Center did not hire Sada but continued to use her on a temporary basis.

Sada, who is of Mexican descent, complained to the California Department of Fair Employment and Housing (DFEH) that, in rejecting her for full-time employment, the Medical Center had violated the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA or the Act). She claimed that she was denied the job because of her national origin and ancestry. Within a few days after the DFEH contacted the Medical Center to investigate Sada's claim, she was terminated.

Sada filed this action under the FEHA, alleging claims of discriminatory hiring and retaliatory termination. The trial court granted summary judgment for the Medical Center, concluding that Sada was not qualified for a full-time position.

On appeal, the parties address the principal legal question of whether the FEHA covers independent contractors. The Medical Center argues that, even if Sada was terminated because she complained about discriminatory hiring, the Act does not apply to her because she was an independent contractor. We find it unnecessary to decide whether the Act covers independent contractors. We conclude that, as an *applicant for an employee position*, Sada was protected against retaliation for protesting discriminatory hiring. Included within the matters protected was Sada's work for the Medical Center on a temporary basis. We further conclude that triable issues of material fact preclude summary judgment on the discriminatory hiring claim. We therefore reverse.

## BACKGROUND

Sada was born in Reynosa, Mexico, in 1950 and is of Mexican ancestry. She is a citizen of the United States. She has blond hair, is light complected, and speaks English without an accent. She is fluent in Spanish.

Sada began her nursing career in Texas. In 1982, she became a licensed vocational nurse and, in 1988, she became licensed as a registered nurse. From 1988 through 1992, Sada held nursing positions with various hospitals in Texas. For health reasons, she took a leave of absence from March 1992 through August 1993. In August 1993, Sada moved to California. Here, she received a temporary license as a registered nurse in September 1993 and a permanent license in April 1994.

Beginning in December 1993, Sada obtained work through a nurses' registry known as Nurse Providers. (See Civ. Code, § 1812.524, subd. (b) [defining "nurses' registry"].) As a registry nurse, Sada worked several days

a month at different hospitals as an independent contractor.[1] From December 1993 through July 28, 1994, she worked in the "definitive observation unit" at the Medical Center. That unit provides telemetry care, which is the electronic monitoring of heart rhythms of cardiac patients. Until the last day of her employment at the Medical Center, Sada did not receive any oral or written criticism of her performance. In fact, she received numerous compliments on her work, including at least 12 written evaluations by charge nurses that praised her performance. Sada typically worked five to eight days a month at the Medical Center.[2]

On one occasion, a Hispanic patient complained to Sada about the lack of Spanish-speaking nurses on a particular shift and his resulting inability to communicate with the staff about the pain he was experiencing. Sada relayed the complaint to Patricia Brendia, the director of the definitive observation unit. In response, Brendia said, "Hispanics spend 20 to 30 years in this country and do not bother to learn English, but they sure can find those public offices where they can get food stamps and all kinds of public assistance."[3]

In May 1994, Sada learned that the Medical Center had openings for full-time employees on the nursing staff in the definitive observation unit. She completed and submitted a job application. On June 6, 1994, Brendia interviewed Sada for one of the positions. During the interview, Brendia spoke favorably of Sada's performance and complimented her ability to complete assignments. At one point, Brendia asked Sada, "Where are you from?" and Sada said that she was from Mexico. Brendia responded by saying twice, "I would never have known," and then asked, "How come you don't have an accent?" Sada explained that she had attended a Catholic school where English was required and some of the teachers were American. Brendia also inquired about Sada's work experience during the 1990-1991 time frame. Sada stated that she had been working at hospitals in the United States and commuting to her home in Mexico. Upon hearing this information, Brendia's eyes "popped open." She stared for a little while and then said, "Well why don't you just go back to Mexico and work there?" Sada replied that she did not want to work in Mexico. She attempted to explain that the only work she had done in Mexico was missionary work, but Brendia interrupted her, saying, "We're going to have to end this." Brendia

---

[1]Sada does not dispute her status as an independent contractor.

[2]Like many other hospitals, the Medical Center relies in part on nurse registries to provide temporary assistance with staffing needs. At the Medical Center, all registry nurses work under the guidance and supervision of a registered nurse who is a full-time employee.

[3]Brendia made a virtually identical remark to Carol Haley, a certified nursing assistant, in the spring of 1994.

told Sada that she was not eligible for the job.[4] Five other individuals were hired to fill the positions.

The day after the interview, Sada telephoned Brendia to explain why she had been living in Mexico and working in the United States. Brendia said that she was too busy to discuss the matter. When Sada asked if she needed to fill out another job application to apply for other nurse positions at the Medical Center, Brendia answered, "There are no openings." Sada then placed a telephone call to the Medical Center's "job line" and learned that there were numerous openings on the nursing staff.

Although Sada was not hired as an employee, the Medical Center continued to use her on an independent contractor basis to work in the definitive observation unit. On July 20, 1994, Sada went to the DFEH and complained that the Medical Center had refused to hire her as an employee because of her national origin and ancestry. Sada did not file a formal charge at that time, but asked the DFEH to attempt to resolve the problem informally.

On July 22, 1994, Robert Hammock, an investigator with the DFEH, spoke by telephone with Louis Gregorio, who worked in the Medical Center's human resources department. Hammock wanted to know why Sada did not get a job offer. Gregorio said he would look into the matter.

Within a day or two, Gregorio talked to Brendia by telephone and asked to see any documentation explaining why Sada was not hired. Gregorio met with Brendia a few days later, at which time he reviewed Sada's job application. Brendia told him that Sada did not get the job because she was not qualified. No other reason was given.

Brendia directed that Sada's job performance be "reevaluated," which occurred on July 28, 1994. The evaluation was performed by Pat Heasley, a registered nurse whom Sada had previously reported for making mistakes in treating a patient.[5] Heasley found alleged deficiencies in Sada's performance and documented them in a written evaluation. On July 29, 1994, Brendia telecopied the evaluation to Sada's registry, together with a "do not send"

---

[4]In the trial court, the Medical Center filed objections to most of the evidence offered in opposition to the summary judgment motion. As an example, the Medical Center objected to the portions of Sada's declaration which described the comments made by Brendia during the job interview. According to the Medical Center, that evidence was inadmissible because it lacked foundation, constituted speculation, and was conclusory. We consider such objections to border on the frivolous.

[5]According to Sada, in late April 1994, Heasley had improperly stopped the feeding of a patient and had failed to perform a test on the patient. Sada told a physician that Heasley was the nurse responsible for those mistakes. As a result, the physician spoke with Heasley by telephone and instructed the unit clerk to "write up" Heasley in order to document the errors. After this incident, Heasley would no longer talk to Sada and, in Sada's words, gave her "dirty looks."

letter, which had the effect of terminating Sada's work at the Medical Center. Brendia did not give Sada an opportunity to explain or refute the alleged deficiencies before terminating her services. On August 3, 1994, Sada wrote a detailed letter to the Medical Center, denying the accusations in the performance evaluation.

On August 11, 1994, Sada filed formal charges with the DFEH, contending that the Medical Center had denied her a full-time position because of her national origin/ancestry and had terminated her in retaliation for protesting the discriminatory hiring decision. This lawsuit followed, in which Sada alleged (1) causes of action against the Medical Center and Brendia for violations of the FEHA, intentional infliction of emotional distress, and negligent infliction of emotional distress, and (2) causes of action against only the Medical Center for intentional and negligent spoliation of evidence. In response to the lawsuit, Brendia told a coworker in late 1994: "Those Mexicans. Sada better drop her lawsuit. We are going to send all their asses back to Mexico."

In September 1995, the Medical Center and Brendia moved for summary judgment or, in the alternative, summary adjudication of issues, arguing that (1) Sada was not hired for a full-time position because she was not qualified, (2) Sada could not maintain a retaliation claim under the FEHA because she was an independent contractor, (3) the retaliation claim failed in any event because Sada was terminated for a legitimate, nonretaliatory reason (i.e., patient errors), and (4) Sada's remaining claims failed for lack of evidence. The trial court concluded that, as a matter of law, Sada was not qualified for the full-time position. Based on that conclusion, the trial court entered judgment in favor of the Medical Center and Brendia. Sada filed a timely appeal from the judgment.

### DISCUSSION

■ Sada contends that the trial court erred in granting summary judgment as to the FEHA and emotional distress claims against the Medical Center. She does not challenge the entry of summary judgment in favor of Brendia or the adjudication of the spoliation of evidence claims in favor of the Medical Center. We conclude that summary judgment as to the Medical Center was improper.

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." (*Hanooka v. Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted; see also Code Civ. Proc., § 437c, subd. (*o*)(2).) We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. (*Kelleher* v. *Empresa Hondurena de Vapores, S.A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (See *Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].)

## A. *Discrimination in Hiring*

■ The FEHA makes it unlawful "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of any person, to refuse to hire or employ the person . . . ." (Gov. Code, § 12940, subd. (a).) As stated, Sada alleged that the Medical Center refused to hire her because of her national origin and ancestry.

■ In determining the propriety of summary judgment on a discrimination claim under the FEHA, we look to the test formulated by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] and *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207] for evaluating claims under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII). (See *Caldwell* v. *Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201-203 [48 Cal.Rptr.2d 448].)

As we have previously recognized: "In most disparate treatment employment discrimination cases, the plaintiff will lack direct evidence of the employer's discriminatory intent, which is a necessary element to prevail. . . . 'Consequently certain rules regarding the allocation of burdens

and order or presentation of proof have developed in order to achieve a fair determination of "the elusive factual question of intentional discrimination." . . . A three-part analysis was mandated by the Supreme Court in the case of *McDonnell Douglas Corp.* v. *Green*[, *supra*, ] 411 U.S. 792 . . . : (1) [t]he complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive.' . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . .

■ "Under the *McDonnell Douglas* test, a prima facie case of employment discrimination through disparate treatment is established if the plaintiff shows: ' "(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." . . .'

"If the employee establishes a prima facie case, 'the employer must offer a legitimate reason for his actions . . . .' . . . However, the burden of persuasion never shifts to the employer; it remains at all times with the employee. . . . 'If the plaintiff establishes a prima facie case, the defendant bears only a burden of going forward with additional evidence of legitimate nondiscriminatory reasons. The defendant does not take on a burden of persuasion.' . . .

"The employer, in order to meet its burden of going forward with additional evidence, 'need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]. To accomplish this, the [employer] must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's] rejection. The explanation provided must be legally sufficient to justify a judgment for the [employer]. If the [employer] carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.' . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"If the employer successfully rebuts the presumption raised by the prima facie case, 'the *McDonnell/Burdine* presumption "drops from the case" and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff. . . . In short the trier

of fact decides whether it believes the employer's explanation of its actions or the employee's.' . . .

"In the third stage of the *McDonnell Douglas* test, the employee, who 'retains the burden of persuasion[,] . . . now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination. [The employee] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. . . .'" (*Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 662-664 [8 Cal.Rptr.2d 151], citations and fn. omitted; accord, *St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502, 506-511 [113 S.Ct. 2742, 2746-2749, 125 L.Ed.2d 407].)[6]

■ Of course, we must keep in mind that the *McDonnell Douglas* test was originally developed for use at trial, not in summary judgment proceedings. "In such pretrial proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.'" (*Caldwell* v. *Paramount Unified School Dist.*, *supra*, 41 Cal.App.4th at p. 203, italics added.) Thus, "'[a]lthough the burden of proof in a title VII action claiming an unjustifiable refusal to [hire] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. . . . In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. . . .'" (*Addy* v.

---

[6]In applying the provisions of the FEHA, California courts often follow decisions construing federal antidiscrimination statutes, as long as those decisions provide appropriate guidance. (See *Camp* v. *Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 635 [41 Cal.Rptr.2d 329].)

*Bliss & Glennon* (1996) 44 Cal.App.4th 205, 216 [51 Cal.Rptr.2d 642], citations omitted.)[7]

Here, the Medical Center contends that Sada's discriminatory hiring claim fails as a matter of law because (1) she was not qualified for the job and (2) she was *less* qualified than the individuals who were actually hired. The question of whether Sada was qualified for the position involves step one of the *McDonnell Douglas* test—the prima facie case—while the question of her comparative qualifications concerns step two—the Medical Center's articulation of a legitimate, nondiscriminatory reason for its decision. (See *Kobrin* v. *University of Minnesota* (8th Cir. 1994) 34 F.3d 698, 702-703; *Taylor* v. *City Nat. Bank* (S.D.W.Va. 1986) 642 F.Supp. 989, 993-994, affd. (4th Cir. 1987) 836 F.2d 547.)

1. *Prima Facie Case*

The Medical Center concedes that Sada belongs to a protected class and that she applied for employment and was rejected. Its argument is that Sada cannot make out a prima facie case because she was not qualified for the job. We conclude that triable issues of material fact exist with respect to "the *minimal* requirements of [the] prima facie case." (*St. Mary's Honor Center* v. *Hicks, supra,* 509 U.S. at p. 506 [113 S.Ct. at p. 2727], italics added.)

We first observe that, when an employer seeks to establish on summary judgment that an applicant was not qualified for a job, it should describe the job qualifications in terms that are as specific and objective as possible. (See *Sempier* v. *Johnson & Higgins* (3d Cir. 1995) 45 F.3d 724, 729; *Lindsey* v. *Prive Corp.* (5th Cir. 1993) 987 F.2d 324, 326-328; *Hill* v. *Seaboard Coast Line R. Co.* (11th Cir. 1985) 767 F.2d 771, 774-775.)

In its moving papers, the Medical Center argued that there were specific deficiencies in Sada's abilities and performance. Brendia submitted a declaration stating that, when she interviewed each job applicant, she asked a series of questions about dysrhythmia analysis. (The list of questions was attached to the summary judgment motion as an exhibit.) According to Brendia, Sada could not answer the questions. Further, Brendia claimed that

[7]The *McDonnell Douglas* test is typically used in cases where the plaintiff lacks "direct" evidence of the employer's discriminatory intent. (*Heard* v. *Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748-1749 [52 Cal.Rptr.2d 620] [discussing direct evidence cases, including "mixed motive" cases].) Both parties to this appeal rely on the *McDonnell Douglas* test, and we therefore do the same. However, we do not suggest that *McDonnell Douglas* provides the only method for evaluating the merit of Sada's FEHA claims. (See *Heard* v. *Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at p. 1750 ["The *McDonnell Douglas* model was 'never intended to be rigid, mechanized, or ritualistic.' "].)

Sada was "extremely reluctant" to take a basic dysrhythmia exam.[8] Finally, Brendia indicated that she told Sada during the interview that, on occasion, she (Sada) did not know "important" information about her patients.

In opposition to the motion, Sada submitted a declaration in which she stated that (1) Brendia had never asked her any questions about dysrhythmia analysis, (2) when Brendia asked whether she would take a basic dysrhythmia exam, she responded, "yes," (3) Brendia had never stated that she (Sada) lacked knowledge about her patients, and (4) the statements in Brendia's declaration on these issues were not true.

Plainly, by disputing each of the points made in Brendia's declaration, Sada raised triable issues of material fact with respect to the showing made by the Medical Center. In addition, Brendia testified at her deposition that Sada's past experience "wasn't unsatisfactory" and that Sada "had [the] minimum qualifications" for the position. This testimony alone indicates that Sada was sufficiently qualified to make out a prima facie case. (See *Hase* v. *Missouri Div. of Employment Sec.* (8th Cir. 1992) 972 F.2d 893, 896; *Foster* v. *Arcata Associates, Inc.* (9th Cir. 1985) 772 F.2d 1453, 1460.)

Moreover, we cannot ignore Sada's evidence that she applied for the "same job" that she was already performing at the Medical Center, albeit on a temporary, as-needed basis. Indeed, as of the date of the interview, Sada's performance in that position had been consistently praised by the charge nurses. Although Brendia testified that registry nurses do not perform all of the duties of a full-time nurse, the Medical Center's written policy provides that registry nurses "will meet the same expectations for Standards of Care, Practice, and Performance as those of Hospital employees." This policy statement suggests that, at a minimum, registry nurses had to be *capable* of satisfactorily performing the duties of a full-time employee, regardless of what duties they were actually assigned.[9]

Thus, the Medical Center did not establish as a matter of law that Sada was unqualified for the position she sought.

---

[8]On this record, we cannot discern the difference, if any, between Sada's alleged inability to answer questions about dysrhythmia and her alleged reluctance to take a dysrhythmia "exam." It appears that the "exam" consisted of something other than simply answering questions, but we do not know anything more about it.

[9]During her deposition, Sada refused to answer certain questions about what she would do in various hypothetical patient situations. From this, the Medical Center argues that Sada lacked the requisite qualifications for the job. We reject this contention for several reasons. First, there was sufficient evidence from other sources indicating that Sada was qualified for the job. Second, if the Medical Center had wanted the answers to those questions, it could have filed a motion to compel. Finally, Sada stated in her declaration that she was not asked any such questions during the job selection process. If the Medical Center made its hiring decision without asking such questions, we fail to see how Sada's refusal to answer them at a deposition means that she was unqualified for the job.

## 2. *Nondiscriminatory Reason for Failure to Hire*

■ The FEHA makes it unlawful for an employer to refuse to hire a person "because of" her national origin, ancestry, or other statutorily specified reasons. (Gov. Code, § 12940, subd. (a).) The Act does not prohibit an employer from rejecting a job applicant because she is less qualified than the person selected. (See *Holt* v. *KMI-Continental, Inc.* (2d Cir. 1996) 95 F.3d 123, 129-130; *Scales* v. *J.C. Bradford and Co.* (6th Cir. 1991) 925 F.2d 901, 907; *Hill* v. *Seaboard Coast Line R. Co.*, *supra*, 767 F.2d at pp. 809-810.) **(1d)** Accordingly, the Medical Center argues that it did not discriminate against Sada because, as a matter of law, she was less qualified than the individuals who were hired. On this record, we disagree.

At her deposition, Sada testified that she had had more than five years of telemetry experience.[10] On her job application, Sada wrote, among other things: "Have taken courses in critical care, basic EKG, mechanical ventilators, chemotherapy administration, management etc. I have worked as a staff and charge RN and as . . . supervisor for almost 3 years in nursing home setting. Have been in nursing for 13 years working mostly with adults and the elderly in a hospital setting. I have experience in mental health nursing also (adults and adolescents)." The application also indicated that Sada had worked from August 1983 to September 1989 at McAllen Medical Center (McAllen), a hospital in Texas, where she obtained experience in "RN staff, med. surg., [and] critical care."[11]

In her declaration, Brendia expressed the opinion that Sada's past work experience did not "come close" to that of the individuals who were hired. According to Brendia, of the persons hired, one had two years of telemetry experience and agreed to work at night;[12] one "had extremely in-depth knowledge of EKGs and had critical care experience"; and another "had critical care and telemetry experience" which "was more suited to [the Medical Center]."

Given the general and sometimes conclusory nature of Brendia's description of the applicants who were hired, we cannot say that, as a matter of law,

[10]It is not clear whether Sada's testimony concerned her telemetry experience as of the date of the job interview (June 6, 1994) or the date of the deposition (Jan. 24, 1995). If it was the latter, then her telemetry experience at the time of the interview was approximately four and one-half years.

[11]Sada stated on the job application that she started working at McAllen as a licensed vocational nurse. The application did not indicate that Sada was a registered nurse during the entire six years she worked there. Consequently, we reject the Medical Center's assertion that the job application misstated Sada's position at McAllen.

[12]The Medical Center offered no evidence that Sada was unwilling to work at night or that she was even asked whether she would do so.

they were more qualified than Sada. By way of example, Brendia sought to distinguish one of the hirees on the ground that she "had critical care and telemetry experience." But Sada had experience in those same areas. Absent evidence indicating how much experience the hiree had or how that experience might have differed from Sada's, we cannot adequately compare the two applicants.[13] Moreover, at her deposition, Brendia stated that she "wouldn't hire anyone just on their past experience." Yet, the Medical Center has failed to indicate what factors other than past experience it considered in making the hiring decisions. Nor has it established through undisputed facts that the successful applicants were superior to Sada in some area other than past experience. Thus, viewing the evidence most favorably to Sada, we conclude that she was at least as qualified as one or more of the hirees.[14]

Finally, assuming that Sada was at least equally qualified for the job, we find that she presented sufficient evidence to raise a triable issue as to pretext. (See *Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181] [where employer makes adequate showing of legitimate reason for its personnel decision in moving for summary judgment, employee must produce "substantial responsive evidence" of pretext].) Suffice it to say that the remarks attributed to Brendia—before, during, and after the job interview—permit an inference that the Medical Center did not consider Sada's application on its merits but, instead, made a hiring decision based on Sada's national origin and ancestry.[15]

In sum, the Medical Center did not establish as a matter of law that it declined to hire Sada based on a legitimate, nondiscriminatory reason. It follows that the trial court erred in adjudicating the discriminatory hiring claim in favor of the Medical Center. In reaching this conclusion, we

[13]The Medical Center contends that, based on Sada's job application, Brendia believed during the job interview that Sada had only six months of telemetry experience (instead of approximately five years) and that she had had a break in employment of four years (instead of one and one-half years). However, even if we use Brendia's figures, we cannot conclude as a matter of law that Sada was less qualified than, for example, the hiree whose critical care and telemetry experience was not described in the summary judgment motion in any detail.

[14]The evidence concerning Sada's qualifications (e.g., her deposition testimony and the information on her job application) does not consist of conclusory allegations or mere self-serving opinions. (See, e.g., *Sample* v. *Aldi Inc.* (7th Cir. 1995) 61 F.3d 544, 549; *Goldberg* v. *B. Green and Co., Inc.* (4th Cir. 1988) 836 F.2d 845, 848.) Consequently, the evidence is adequate to establish her qualifications.

[15]Brendia's derogatory comments about Mexicans and her statements to Sada during the job interview raise a triable issue of fact as to pretext. They do not constitute the type of isolated or stray remarks that are immaterial in proving a discriminatory motive. (See, e.g., *Nesbit* v. *Pepsico, Inc.* (9th Cir. 1993) 994 F.2d 703, 705; *Merrick* v. *Farmers Ins. Group* (9th Cir. 1990) 892 F.2d 1434, 1438-1439; *McCarthy* v. *Kemper Life Ins. Companies* (7th Cir. 1991) 924 F.2d 683, 686-687.)

acknowledge that "[a]n important public interest exists in preserving a hospital's ability to make managerial and policy determinations and to retain control over the general management of the hospital's business." (*Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1184-1185 [270 Cal.Rptr. 894].) ■ "This Court does not sit as a super-personnel department that reexamines an entity's business decisions. . . . The question is not whether the [employer] exercised prudent business judgment [but whether it made an unlawful hiring decision]." (*Dale* v. *Chicago Tribune Co.* (7th Cir. 1986) 797 F.2d 458, 464, citations omitted.)

■ The evidence before us strongly suggests that, because of her national origin and ancestry, Sada may have been rejected for a full-time nursing position for which she was at least as qualified as some of the successful applicants. By directing that the case proceed to trial, we do not substitute our legal judgment for the employer's medical knowledge. Rather, we only give effect to the FEHA's founding principle that "denying employment opportunity . . . for [unlawful] reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (Gov. Code, § 12920.)

## B. *Retaliatory Termination*

The FEHA makes it unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person [(1)] because the person has opposed any practices forbidden under this [Act] or [(2)] because the person has filed a complaint, testified, or assisted in any proceeding under this [Act]." (Gov. Code, § 12940, subd. (f).)[16]

■ As with Sada's discriminatory hiring claim, the *McDonnell Douglas* test applies in evaluating the propriety of summary judgment on her retaliation claim. (See *Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467 [4 Cal.Rptr.2d 522]; *Addy* v. *Bliss & Glennon, supra,* 44 Cal.App.4th at pp. 215-217.) In a retaliation case, the *McDonnell Douglas* test "require[s] that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant articulate a legitimate nonretaliatory explanation for its acts, and (3) the plaintiff show that the defendant's proffered explanation is merely a pretext for the illegal termination. . . . [¶] To establish a prima facie case,

---

[16]In Title VII parlance, the two clauses of the antiretaliation provision are known respectively as the "opposition clause" and the "participation clause." (*Robinson* v. *S.E. Pa. Transp. Authority, Red Arrow* (3d Cir. 1993) 982 F.2d 892, 896.)

the plaintiff must show that he engaged in a protected activity, [the] employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action. . . . [¶] . . . [¶] Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination." (*Flait* v. *North American Watch Corp.*, *supra*, 3 Cal.App.4th at pp. 476-479, citations omitted.)[17]

The Medical Center argues that Sada's retaliation claim fails as a matter of law because (1) she was terminated for a legitimate, nonretaliatory reason (i.e., her unsatisfactory performance) and (2) the FEHA does not protect an independent contractor from retaliation. We discuss these contentions in turn.

### 1. *Nonretaliatory Reason for Termination*

■ The Medical Center contends that Sada was terminated because of serious patient care errors that were discovered when Pat Heasley evaluated her performance on July 28, 1994.[18] On August 3, 1994, Sada wrote to the Medical Center, denying that she had committed any mistakes.[19] In her declaration opposing summary judgment, Sada also stated that the accusations in the evaluation were false. As a result, there are triable issues of material fact with respect to the Medical Center's stated reason for terminating Sada.

Further, Sada presented sufficient evidence of pretext: the evidence supports an inference that the Medical Center's stated reason for its decision was merely a subterfuge for retaliatory conduct. Until Brendia learned that Sada had complained to the DFEH about the Medical Center's hiring

---

[17]There is no dispute that Sada engaged in protected activity by contacting the DFEH. "Opposition to practices prohibited by the Act includes, but is not limited to: [¶] . . . [s]eeking the advice of the [DFEH], whether or not a complaint is filed . . . ." (Cal. Code Regs., tit. 2, § 7287.8, subd. (a)(1)(A).)

[18]According to Heasley, Sada: (1) failed to give intravenous medication to the patient in room 252-A; (2) did not timely give a blood transfusion to the patient in room 250-A, and failed to inform the treating physician of the untimely transfusion and of the patient's high temperature; and (3) did not make sure that the patient in room 249-2 took his medication but nevertheless marked his chart to indicate that the medication was taken.

[19]According to Sada, she: (1) gave the patient in room 252-A his intravenous medication but he kept removing the "iv" to take frequent smoke breaks, so she informed the treating physician of the patient's noncompliance; (2) gave the patient in room 250-A a blood transfusion after informing the treating physician of the patient's high temperature and after the patient's temperature returned to normal; and (3) gave the patient in room 249-2 all of his medication, which he took, so that any extra doses in the medicine cassette were probably from an earlier shift or for a later shift.

decision, Sada had received oral compliments on her work and 13 written evaluations that praised her performance. She had not received any criticism of her work, either orally or in writing. After the Medical Center failed to hire Sada as a full-time nurse (on June 6, 1994), it continued to use her services on a temporary basis, presumably because it was satisfied with her abilities. Brendia learned about Sada's DFEH complaint on or about July 26, 1994. Two days later, at Brendia's direction, Sada's performance was "reevaluated."[20] That evaluation was conducted by Heasley, who had previously been "written up" after Sada reported Heasley's inadequate performance to a physician. (See fn. 5, *ante*.) Based on Sada's evaluation—the first to criticize her—Brendia decided to terminate Sada's services. A few months later, Brendia commented: "Those Mexicans. Sada better drop her lawsuit. We are going to send all their asses back to Mexico."

In light of several factors—the timing of the Medical Center's termination decision (i.e., a few days after Brendia learned about Sada's DFEH complaint), the identity of the person making the decision (i.e., a supervisor who made anti-Mexican remarks before and after rejecting Sada for full-time employment), and Sada's job performance before termination (i.e., praiseworthy until Brendia ordered a "reevaluation")—we conclude that Sada raised a triable issue as to whether the Medical Center terminated her in retaliation for her DFEH complaint.[21]

### 2. *FEHA Coverage of Nonemployees*

As stated, the FEHA makes it unlawful for an employer to retaliate against "any person" for opposing practices prohibited by the Act or for participating in proceedings under the Act. (See Gov. Code, § 12940, subd. (f).) The Medical Center argues that Sada cannot maintain a retaliation claim because the FEHA does not protect independent contractors from retaliation. Sada

---

[20]Brendia claims that the reevaluation was first mentioned during Sada's June 6, 1994, interview for the full-time position. According to Brendia, she told Sada during the interview that, at some point in the future, Sada's performance would be reevaluated. Sada has denied that any such statements were made.

[21]The Medical Center emphasizes that the performance evaluation which lead to Sada's termination was performed by Heasley, who did not know about Sada's complaint to the DFEH. However, Brendia, who did know about the complaint, was the person who ordered the "reevaluation" in the first place, and she terminated Sada's services based on Heasley's accusations. Moreover, according to Sada, Heasley had personal reasons to falsely criticize her performance. In light of this and other evidence of pretext, Heasley's lack of knowledge of the DFEH complaint does not dispose of the retaliation claim as a matter of law.

counters that we should interpret the term "any person" in accordance with its plain meaning, which would include her.[22]

Where constitutional rights are involved, public employers may be prohibited from retaliating against independent contractors. (See *Board of County Commrs.* v. *Umbehr* (1996) 518 U.S. __ [116 S.Ct. 2342, 135 L.Ed.2d 843] [First Amendment of federal Constitution prevents government employer from terminating at-will contract of independent contractor in retaliation for contractor's criticism of government]; *O'Hare Truck Service, Inc.* v. *City of Northlake* (1996) 518 U.S. __ [116 S.Ct. 2353, 135 L.Ed.2d 874] [independent contractors are covered by First Amendment rule that public employees cannot be discharged for refusing to support political party or its candidates unless party affiliation is an appropriate requirement for effective performance of job].) However, under antidiscrimination statutes, independent contractors arguably do not fare as well.

The Medical Center argues forcefully that the FEHA does not apply to independent contractors. The Fair Employment and Housing Commission (FEHC), the administrative agency charged with interpreting the Act (see Gov. Code, § 12935, subds. (a), (h)), has consistently taken the position, through its decisions and regulations, that the Act affords no protection to independent contractors *qua* independent contractors. (See *Dept. Fair Empl. & Hous.* v. *Children's Hospital and Health Center* (1987) No. 87-24, FEHA Precedential Decs. 1986-1987, CEB 10, pp. 5-7; Cal. Code Regs., tit. 2, § 7286.5, subd. (b)(1); see also *Lumia* v. *Roper Pump Co.* (N.D. Cal. 1989) 724 F.Supp. 694, 697-698 [adopting FEHC's position in age discrimination case].)[23]

Further, to the extent that the California Fair Employment Practice Act, the predecessor of the FEHA, was modeled after New York's antidiscrimination law (see *Robinson* v. *Fair Employment & Housing Com.*, *supra*, 2 Cal.4th at p. 237), we note that New York courts have held that their statute "applies solely to employees and not to independent contractors." (*Mehtani*

---

[22]At the time Sada was terminated, the Act defined "person" as including "one or more individuals, partnerships, associations, corporations, legal representatives, trustees in bankruptcy, and receivers or other fiduciaries." (Gov. Code, § 12925, subd. (d), added by Stats. 1980, ch. 992, § 4, p. 3143.) This definition does not provide guidance in resolving the question before us.

[23]" 'Consistent administrative construction of a statute over many years . . . is entitled to great weight and will not be overturned unless clearly erroneous.' " (*Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 234 [5 Cal.Rptr.2d 782, 825 P.2d 767].) However, "[e]ven though the court will give great weight to an administrative agency's interpretation of its own regulations and the statutes under which it operates, [issues of statutory construction present] questions of law which the court must ultimately resolve." (*Id.* at p. 235, fn. 6.)

v. *New York Life Ins. Co.* (1989) 145 A.D.2d 90, 93 [537 N.Y.S.2d 800, 802] [construing N.Y. Exec. Law § 296(1)(a) (McKinney 1993), derived from former N.Y. Exec. Law § 131(1) (1945 N.Y. Laws, ch. 118, § 1)]; accord, *Sone* v. *Tsumura* (1995) 222 A.D.2d 231, 232 [634 N.Y.S.2d 689, 691].) Moreover, Title VII's antidiscrimination provision (42 U.S.C. § 2000e-2(a)(1))[24] has been interpreted to exclude independent contractors. (See, e.g., *Alexander* v. *Rush North Shore Medical Center* (7th Cir. 1996) 101 F.3d 487, 491-492; *Wilde* v. *County of Kandiyohi* (8th Cir. 1994) 15 F.3d 103, 104; *Tadros* v. *Coleman* (S.D.N.Y. 1989) 717 F.Supp. 996, 1002-1006, affd. (2d Cir. 1990) 898 F.2d 10; see also *Falls* v. *Sporting News Pub. Co.* (6th Cir. 1987) 834 F.2d 611, 613 [Michigan statute prohibiting employers from discriminating against "an individual" does not apply to independent contractors].)[25]

Nevertheless, regardless of the strength of the Medical Center's argument, we find it unnecessary to decide in this case whether the FEHA protects independent contractors against retaliation. This is so because Sada's termination claim is not premised on her status as an independent contractor. Rather, she was allegedly retaliated against because she complained about discrimination as an *applicant for an employee position.*

Unquestionably, the FEHA's antidiscrimination provision protects applicants for employee positions from discrimination based on national origin, ancestry, and other specified grounds. (See Gov. Code, §§ 12940, subd. (a), 12941, subd. (a).) That provision makes it actionable for an employer "to refuse to hire or employ [a] *person* . . . or to discharge [a] person from employment" for an unlawful discriminatory reason. (Gov. Code, § 12940, subd. (a), italics added; see also *id.*, § 12941.) Thus, the statutory language makes clear that an applicant—a "person" who seeks to be hired or employed—is protected against discrimination.[26]

As stated, the FEHA's antiretaliation provision makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against *any person*

---

[24]That provision states in part: "It shall be an unlawful employment practice for an employer— [¶] (1) to fail or refuse to hire or to discharge *any individual* . . . because of such individual's race, color, religion, sex, or national origin . . . ." (42 U.S.C. § 2000e-2(a)(1), italics added.)

[25]The antiretaliation provision of Title VII makes it unlawful for an employer to take adverse action against "any of his *employees* or *applicants for employment* . . . because [they have] opposed any practice made an unlawful employment practice by this [act], or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [act]." (42 U.S.C. § 2000e-3(a), italics added.) We think this language on its face bars coverage of independent contractors.

[26]Court decisions are in accord. (See, e.g., *Cassista* v. *Community Foods, Inc.* (1993) 5 Cal.4th 1050, 1052-1055 [22 Cal.Rptr.2d 287, 856 P.2d 1143] [discussing applicant's physical disability discrimination claim]; *Levy* v. *Regents of University of California* (1988) 199 Cal.App.3d 1334, 1338-1347 [245 Cal.Rptr. 576] [discussing applicant's age discrimination

because the person has opposed any practices forbidden under this [Act] or because the person has filed a complaint, testified, or assisted in any proceeding under this [Act]." (Gov. Code, § 12940, subd. (f), italics added.) We can think of no reason why the word "person," as used in the antidiscrimination provision, should be interpreted more narrowly for purposes of the antiretaliation provision. Significantly, the Legislature has directed that "[t]he provisions of [the Act] . . . be construed liberally for the accomplishment of the purposes thereof." (Gov. Code, § 12993, subd. (a).) One of the primary goals of the prohibition on discrimination—to eliminate bias in hiring—would be undermined if an employer could lawfully retaliate against an applicant because she had complained about discriminatory hiring practices. The antiretaliation provision should not be interpreted in a way that encourages silence among those who reasonably believe that an employer has refused to hire them for prohibited reasons.[27] To effectively remedy discrimination in hiring, an applicant should be able to come forward with her complaint without fear of reprisal.[28] Consequently, we conclude that the antiretaliation provision of the FEHA covers applicants for employee positions.[29]

It does not matter that the Medical Center may have retaliated against Sada *after* the hiring decision was made, i.e., when Sada was technically a

---

claim]; *Ibarbia* v. *Regents of University of California* (1987) 191 Cal.App.3d 1318, 1321-1329 [237 Cal.Rptr. 92] [discussing national origin discrimination in applicant context].) Similarly, the FEHC's decisions and regulations apply the antidiscrimination provision to applicants. (See *Dept. Fair Empl. Prac.* v. *American National Insurance Company* (1978) No. 78-02, FEHA Precedential Decs. 1978-1979, CEB 1, p. 7, affd. *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603 [186 Cal.Rptr. 345, 651 P.2d 1151]; *Dept. Fair Empl. & Hous.* v. *Nursefinders of Oakland, Inc.* (1985) No. 83-14, FEHA Precedential Decs. 1982-1983, CEB 14, pp. 14-16; Cal. Code Regs., tit. 2, §§ 7286.5, subd. (h), 7286.6, subd. (b).)

[27]Under the opposition clause, an applicant is protected from retaliation even if there is no discrimination in fact, provided she has a reasonable, good faith belief that the employer is violating the Act. (See *Flait* v. *North American Watch Corp.*, *supra*, 3 Cal.App.4th at p. 477.) Under the participation clause, an applicant is protected from retaliation regardless of the ultimate resolution of the underlying charge. (See, e.g., *Archuleta* v. *Colorado Dept. of Institutions* (10th Cir. 1991) 936 F.2d 483, 486-487; *Wolf* v. *J.I. Case Co.* (E.D.Wis. 1985) 617 F.Supp. 858, 868.)

[28]If applicants were not covered by the antiretaliation provision, a prospective employer could lawfully refuse to hire a person because she had previously brought a discrimination charge or action against a former employer. Courts have held that such employer conduct constitutes unlawful retaliation under Title VII. (See, e.g., *Bacon* v. *Secretary of Air Force* (S.D.Ohio 1991) 785 F.Supp. 1255, 1264-1265, affd. (6th Cir. 1993) 7 F.3d 232; *Barela* v. *United Nuclear Corporation* (D.N.M. 1970) 317 F.Supp. 1217, 1218, affd. (10th Cir. 1972) 462 F.2d 149.)

[29]Our holding is limited to applicants for *employee* positions. We do not suggest that applicants for independent contractor positions have the same (or any) protection under the Act.

"former applicant." By definition, "retaliation" occurs only after the applicant has complained about not getting the job or after she has begun to participate in a proceeding under the Act. At that point, she is obviously no longer applying for the position. She is nonetheless permitted to pursue a retaliation claim because it arises out of the employer's allegedly discriminatory rejection of her as an applicant. To hold otherwise would insulate a whole category of retaliatory conduct from liability.

For similar reasons, the United States Supreme Court recently held that Title VII's antiretaliation provision (42 U.S.C. § 2000e-3(a)) applies to former, as well as current, employees even though Title VII expressly covers "employees," not "former employees." (*Robinson* v. *Shell Oil Co.* (1997) 519 U.S. __ [117 S.Ct. 843, 136 L.Ed.2d 808]; see fn. 25, *ante* [quoting Title VII antiretaliation provision].) In *Robinson*, the plaintiff filed an administrative charge of race discrimination against his former employer after he had been discharged. While the charge was pending, the plaintiff applied for a job with another company. The former employer allegedly retaliated against the plaintiff by giving the prospective employer a negative job reference.

In holding that Title VII prohibits postemployment retaliation, the high court explained: "[The plaintiff] argues that the word 'employees' includes former employees because to hold otherwise would effectively vitiate much of the protection afforded by [the antiretaliation provision]. . . . According to [the Equal Employment Opportunity Commission (EEOC)], exclusion of former employees from the protection of [the antiretaliation provision] would undermine the effectiveness of Title VII by allowing the threat of post-employment retaliation to deter victims of discrimination from complaining to EEOC . . . . [¶] Those arguments carry persuasive force given their coherence and their consistency with a primary purpose of antiretaliation provisions: Maintaining unfettered access to statutory remedial mechanisms. . . . EEOC quite persuasively maintains that it would be destructive of this purpose of the antiretaliation provision for an employer to be able to retaliate with impunity against an entire class of acts under Title VII—for example, complaints regarding discriminatory termination." (519 U.S. at p. __ [117 S.Ct. at pp. 848-849].) We believe that this same analysis applies to an applicant's complaint about discriminatory hiring.

 Finally, we conclude that Sada's termination as a temporary nurse was a form of prohibited retaliation. Although the Act does not actually use the words "retaliate" or "retaliation," it does broadly prohibit an employer from "discharg[ing], expel[ling], or otherwise discriminat[ing]" against any person because she has engaged in protected activity. (Gov. Code, § 12940, subd. (f).) The FEHC has interpreted the Act to prohibit a variety of

retaliatory conduct, including the denial or loss of compensation. (See Cal. Code Regs., tit. 2, §§ 7287.8, subd. (a), 7286.5, subd. (f).)

We think it plain that Sada was "expelled" or "discharged" from the Medical Center. She was also denied further compensation as a temporary nurse. Put simply, if a negative job reference can constitute an unlawful form of retaliation (see *Robinson* v. *Shell Oil Co.*, *supra*, 519 U.S. __ [117 S.Ct. 843, 136 L.Ed.2d 808]; *Rutherford* v. *American Bank of Commerce* (10th Cir. 1977) 565 F.2d 1162, 1164), so can the loss of compensation from temporary work. (See also 1 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) pp. 668-671 [discussing types of prohibited retaliatory conduct].

Accordingly, the trial court erred in adjudicating the retaliation claim in favor of the Medical Center by way of summary judgment.

C.-E.*

. . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgment is affirmed with respect to the adjudication of the cause of action for negligent infliction of emotional distress. In all others respects, the judgment is reversed. Appellant is entitled to costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied July 18, 1997, and respondent's petition for review by the Supreme Court was denied September 24, 1997.

---

*See footnote, *ante*, page 138.