Filed 4/29/13  Ragan v. Southern Cal. Edison Co. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| KENNETH RAGAN, | |
| Plaintiff and Appellant, | E052723 |
| v. | (Super.Ct.Nos. CIVRS808404 & CIVRS812937) |
| SOUTHERN CALIFORNIA EDISON COMPANY, | OPINION |
| Defendant and Respondent; | |
| _____ | |
| TYRUS MCDOWELL, | |
| Plaintiff and Appellant, | |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Keith D. Davis, Judge.  Affirmed.

Daniel T. Streeter, Jr., for Plaintiffs and Appellants.

John D. Buchanan and Lauren E. Robinson for Defendant and Respondent.

Kenneth Ragan (Ragan) sued Southern California Edison (Edison) for breach of contract, employment discrimination, retaliation, wrongful termination, and interference with prospective economic advantage. Tyrus McDowell (McDowell) sued Edison for breach of contract and wrongful demotion. In both lawsuits, the trial court granted summary judgment in favor of Edison. Ragan and McDowell (collectively referred to as "Plaintiffs") contend the trial court erred because they presented triable issues of material fact. We affirm the judgments.

## FACTUAL AND PROCEDURAL HISTORY

### A.    RAGAN'S COMPLAINT

Ragan began working for Edison in 1984. Ragan was employed as a lineman. Edison created various safety manuals, such as the *Accident Prevention Manual* and the *Transmission & Distribution Underground Grounding Manual.* If an employee were to violate the directions in the manuals, then the employee could be terminated. Edison asserted Ragan violated the safety directives and terminated his employment. Ragan denied violating the safety regulations.

Ragan alleged Edison terminated his employment in substantial part due to his race. Ragan is White, while the person responsible for his termination is Hispanic. Ragan asserted Edison demonstrated a pattern of "'reverse discrimination' at the Fontana worksite and/or office, wherein [Ragan] was assigned." Additionally, Ragan is over 40 years old. Ragan alleged he was also fired due to age discrimination. Ragan

2

asserted his "salary, retirement and benefits package at the time of his termination, [were] significantly greater than those of similarly titled and/or situated employees who did not have his seniority and/or tenure of service."

Ragan was a member of the International Brotherhood of Electrical Workers (IBEW). There was a collective bargaining agreement in place between IBEW and Edison, which covered Ragan's employment. During his employment with Edison, Ragan voiced complaints and utilized grievance procedures. For example, Ragan complained about "favoritism manifested by certain supervisors and lax compliance with safety and other important practices." Ragan associated with other employees who expressed complaints. Ragan asserted his termination was partly due to retaliation for his complaints.

Ragan further alleged Edison interfered with his working for various other companies as a subcontractor or independent contractor by "attempting to dissuade them from hiring" Ragan.

B.     MCDOWELL'S COMPLAINT

McDowell began working for Edison in 1983. McDowell was employed as a groundman. McDowell was a member of IBEW, and his employment was covered by the IBEW/Edison collective bargaining agreement. Edison created safety manuals, such as the *Accident Prevention Manual* and the *Transmission and Distribution Underground Grounding Manual*. If an employee violated the safety directives in the manuals, then the employee could suffer adverse employment actions.

3

Edison demoted McDowell due to McDowell violating the safety guidelines. McDowell denied violating the safety directions or violating them in the manner described by Edison. McDowell asserted Edison's true reasons for demoting him were (1) racial discrimination, (2) age discrimination, and (3) whistleblowing.

C. SUMMARY JUDGMENT AGAINST RAGAN

Edison moved for summary judgment against Ragan. Edison asserted Ragan's causes of action for (1) breach of contract, and (2) breach of the implied covenant of good faith were preempted by federal law, specifically the Labor Management Relations Act. Edison argued Ragan's remedies for alleged improper disciplinary action were limited to the grievance and arbitration process set forth in the IBEW/Edison collective bargaining agreement.

Further, Edison argued Ragan's causes of action for (1) discrimination, (2) retaliation, and (3) wrongful termination failed because Ragan's employment was terminated due to "his record of failures to adhere to [Edison's] safety rules and policies in the performance of his duties as a journeyman lineman." Edison asserted Ragan's claim for interference with prospective economic advantage failed because Ragan did not establish the wrongful conduct element.

Edison contended all of its employees were expected to adhere to the rules set forth in the *Accident Prevention Manual*. In March 2002, "Ragan was suspended for failing to verify the proper steps in a switching procedure resulting in a switching error." On August 8, 2005, Ragan was suspended without pay after an investigation revealed that "on July 19, 2005, he and the crew under his supervision had not followed

4

standard operating procedures under [*Accident Prevention Manual*] rule #309 in making a preventable error in connecting cables to new switching equipment which created a hazardous condition and seriously jeopardized the safety of another crew."

Upon Ragan's reinstatement, Edison issued him a memorandum warning: "'The Accident Prevention manual and the rules within are put there for the safety of you and your co-workers, any future incidents or rule violations of the same nature could lead to further disciplinary action up to and including further suspension and or termination of your employment at [Edison].'"

On August 11, 2005, Edison suspended Ragan for 10 days after an investigation revealed that "on July 31, 2005 he operated a fused burd [Buried Underground Residential Distribution] switch by himself in violation of [*Accident Prevention Manual*] Rule 309b." A memorandum given to Ragan upon his reinstatement warned, "Any future incidents or rule violations of the same nature will lead to the termination of your employment with [Edison]."

On July 20, 2006, Ragan was suspended for five days "after he engaged in insubordinate and unprofessional conduct in violation of [Edison's human resources] polices." Ragan lost his temper with a supervisor and used profanity while "verbally assaulting" the supervisor. A memorandum given to Ragan upon his reinstatement provided, "Mr. Ragan please be advised that after the incident above, and the fact that you were severely disciplined less than a year ago for your violations of corporate safety and operating policies, that you must show absolute improvement in your attitude and compliance toward Edison's protocol, policies and procedures. Any future incidents or

5

rule violations of the same nature will lead to the termination of your employment with [Edison]." The memorandum further provided Ragan would be ineligible for supervisory or training positions for at least one year. In resolving a grievance over the suspension and reinstatement letter, Edison agreed to modify some of the language in the July 2006 memorandum. The reissued letter included the foregoing warning about possible termination.

On November 16, 2006, Ragan was part of a crew assigned to work on overhead and underground lines in Chino Hills. The crew consisted of Ragan, McDowell, a second journeyman lineman, and an apprentice lineman. McDowell was the crew foreman, who led the crew's work. While working, the crew cut the power to the nearby state juvenile correctional facility, which required the facility to operate on emergency generator power. The crew worked for 32 straight hours before they were relieved, per Edison rules. The crew had not completed the work in the expected timeframe, and the correctional facility was at risk of exhausting its emergency generator power.

Ontario District Manager, Fernando Valenzuela (Valenzuela), and one of Ragan's immediate supervisors, Ray Cervantes (Cervantes), inspected the jobsite to review the progress of the work, due to the expected timeline not being met. The routine check revealed the crew might have unsafely operated an underground gas insulated electrical switch—the gas level in the switch was too low. Operating the switch with low gas would violate Edison's safety procedures and could have caused a serious injury to the crew if the switch failed.

On November 20, 2006, Valenzuela directed two supervisors and a safety expert to investigate whether any safety violations had occurred at the Chino Hills jobsite. McDowell and Ragan were asked to provide written statements about their activities at the jobsite, and they were individually interviewed on two occasions. Ragan, McDowell, and the other crew members were assisted by an experienced union steward during the individual interviews. The investigation team concluded the crew violated several safety rules.

Due to Ragan's past disciplinary record the investigation team recommended Ragan's employment be terminated due to the safety violations committed on November 16, 2006. The team also recommended other crew members be disciplined based upon their individual rule violations, level of responsibility for the work, and history of disciplinary action.

Upon reading the investigative team's report, considering Ragan's history of safety violations, and Ragan's current violations, Valenzuela no longer had confidence Ragan could work on electrical distribution systems in a safe and consistent manner. Valenzuela confirmed his decision to terminate Ragan with regional manager, Gilbert Ayala, who then confirmed the decision with senior managers. Valenzuela terminated Ragan on January 4, 2007. Valenzuela instructed Ragan to return $700 worth of lineman's raingear.

Ragan filed a grievance over his termination. IBEW and Edison settled Ragan's grievance by Edison offering to rehire him "in the less safety sensitive position of groundman." Ragan had to reapply for employment before December 1, 2007. Due to

7

the settlement agreement, IBEW withdrew the grievance and declined binding arbitration on the question of whether Edison had just cause to terminate Ragan. Ragan never reapplied for employment with Edison.

On June 5, 2007, six months after being terminated by Edison, Ragan worked for Pouk & Steinle, an Edison contractor. In July 2007, an Edison employee who coordinated work with contractors, advised Pouk & Steinle that Ragan was not permitted on Edison property until he returned his Edison raingear. On July 15, 2007, Pouk & Steinle terminated Ragan's employment. Ragan asserted he was terminated because he could not work as a coordinator at Edison's Victorville Service Center, although he could have worked as a lineman or groundman who did not need to enter Edison property. Ragan returned the raingear in fall 2007. Edison argued summary judgment should be granted on the interference with a prospective economic advantage claim because Ragan could not establish Edison wanted or intended for Pouk & Steinle to fire Ragan.

D.    SUMMARY JUDGMENT AGAINST MCDOWELL

Edison moved for summary judgment against McDowell. Edison asserted McDowell's causes of action for (1) breach of contract, and (2) breach of the implied covenant of good faith were preempted by federal law, specifically the Labor Management Relations Act. Edison asserted McDowell's only contract with Edison was the collective bargaining agreement, and therefore the collective bargaining agreement provided McDowell's only remedies. The collective bargaining agreement limited McDowell's remedies to the grievance and arbitration process.

8

Edison argued McDowell's breach of contract claims were essentially alleging Edison breached the collective bargaining agreement by improperly demoting him, which required an interpretation of the collective bargaining agreement and therefore caused the claims to be preempted by federal law.

Edison argued McDowell's wrongful demotion claim failed because it was preempted by federal law. Alternatively, if the court concluded the claim did not require interpretation of the collective bargaining agreement, and was based upon the Fair Employment and Housing Act (FEHA), then the claim failed because McDowell was demoted for a legitimate reason.

On July 19, 2005, McDowell and a crew under his supervision violated several safety rules. While replacing a gas switch, McDowell and his crew connected the wrong cable, which resulted in paralleling two circuits, jeopardizing the crew's safety. McDowell was placed on a three-day disciplinary suspension.

On May 19, 2006, McDowell was standing behind a trainee who "was energizing an electrical panel in an underground vault when an unanticipated electrical flash occurred." McDowell was not wearing the proper safety equipment, and he suffered injuries. The trainee, who was wearing the proper safety equipment, was not injured. Edison suspended McDowell from July 10 to July 17, 2006, due to McDowell's failure to wear safety equipment. In November 2006, after McDowell recovered and returned to work, Edison gave McDowell a memorandum reflecting "any further safety violations would lead to additional disciplinary action including demotion or termination."

9

On November 16, 2006, McDowell was the foreman of the crew assigned to the Chino Hills jobsite. A description of the November 16 incident is set forth *ante*. The investigation team concluded McDowell violated several safety rules during the November 16 Chino Hills job. Based upon McDowell's safety violations and his past disciplinary record, the investigation team recommended McDowell be demoted to lineman.

Upon reviewing the investigation team's report and McDowell's safety violations, Valenzuela no longer had confidence McDowell could safely lead a crew; however, he believed McDowell could contribute in a non-supervisory role. Thus, Valenzuela decided to demote McDowell to journeyman lineman and reassigned him to a different work location. Valenzuela confirmed the demotion decision with the regional manager, Gilbert Ayala, who confirmed the decision with senior managers. Valenzuela demoted McDowell to lineman on December 20, 2006.

E.    OPPOSITIONS OF RAGAN AND MCDOWELL TO THE MOTIONS
      FOR SUMMARY JUDGMENT

Ragan and McDowell opposed Edison's motions for summary judgment. McDowell dropped his breach of contract causes of action. As to the wrongful termination claim, McDowell asserted he did not violate Edison's safety procedures, and therefore he was not demoted for a legitimate purpose. McDowell argued he was demoted due to racial discrimination. McDowell is White. McDowell asserted the following evidence created a triable issue of material fact: (1) during a telephone conversation between McDowell and the leader of Edison's investigative team

10

(Santiago), Santiago expressed an unwillingness to demote McDowell, "thus allowing a rational fact[]finder to infer that the safety violation claim is false"; (2) Mr. Flores, the replacement crew foreman on the night of the Chino Hills incident, committed a serious safety violation at the same jobsite but was not investigated or disciplined; (3) Edison's safety expert said he knew of no safety violations committed by McDowell at the Chino Hills jobsite; and (4) Valenzuela could not describe McDowell's alleged violations.

In regard to Ragan, much of the opposition memorandum reflects only that Ragan's position is identical or very similar to McDowell's position. For example, the opposition reflects, "Ragan's cause for FEHA based race discrimination in employment is identical to McDowell's." Ragan argued his claim for retaliatory firing involved a triable issue of material fact because Ragan placed three calls to Edison's ethics and compliance department.

In regard to the interference cause of action, Ragan argued there was a triable issue of material fact because it was silly for a multi-million dollar company to complain about a 26-year employee taking $700 worth of equipment. Ragan asserted he was fired by Pouk & Steinle because Edison said Ragan was not permitted on Edison property.

F.    REPLY TO MCDOWELL'S OPPOSITION

Edison responded to McDowell's opposition. Edison asserted McDowell failed to provide any evidence that he was demoted due to his race. Edison argued McDowell was only speculating that race was a factor in his demotion. Thus, Edison argued McDowell failed to create a triable issue of material fact on the discrimination cause of

11

action. Edison further asserted the failure to investigate another employee's alleged violation of a safety rule did not mean Edison lacked a legitimate purpose for demoting McDowell. Edison argued that without the disciplinary record of the other employee, nothing can be inferred. Edison argued McDowell's reliance on Santiago's statement about not wanting to demote McDowell should be disregarded as inadmissible hearsay.

G. REPLY TO RAGAN'S OPPOSITION

Edison asserted Ragan was fired due to violating the safety rules, which is a legitimate purpose for terminating employment. Edison argued there was not a triable issue of material fact because Ragan was only speculating that he was fired due to his race and/or age. In regard to Ragan's assertion that he heard Santiago say he disagreed with Ragan's termination, Edison argued that evidence would not support a finding Ragan was fired for a discriminatory or retaliatory purpose, and Santiago's hearsay statement did not explain whether Santiago disagreed with the finding of safety violations as well as the decision to fire Ragan—so Santiago might have agreed with the violation findings. Further, Edison argued the evidence concerning the replacement foreman for the Chino Hills jobsite not being disciplined was irrelevant since there was nothing indicating he was similarly situated to Ragan.

H. HEARING

At the summary judgment hearing, the trial court announced its tentative decision was to grant Edison's motions for summary judgment. The trial court explained Edison had presented "ample evidence of its reasonable, rational and legitimate basis" for terminating Ragan and demoting McDowell. The trial court stated there was no

12

evidence demonstrating Edison had a pretext for disciplining Ragan.  As to Ragan's and McDowell's breach of contract causes of action, the trial court stated they were moot.

Ragan and McDowell argued the investigation into the Chino Hills incident was not thorough or lengthy, and they did not commit any safety violations.  Further, there was evidence employees and managers referred to the many Hispanic supervisors as the "'Mexican Mafia.'"  Plaintiffs argued they did not need direct evidence of a supervisor saying a racial slur to prove a discriminatory motive.  Next, Plaintiffs argued Valenzuela pushed the investigatory team on the Chino Hills incident.  Plaintiffs assert the investigatory team initially found a "non-event," but Valenzuela told them to "go back" and find discrepancies in the crew members' stories.

Plaintiffs argued Edison holds a "near miss" meeting, where crew members gather to discuss mishaps at jobsites and how to avoid them in the future.  Plaintiffs asserted the Chino Hills incident was never discussed at a "near miss" meeting.  Plaintiffs noted Santiago said he never found Plaintiffs "violated anything respecting [the Chino Hills] switch."

In regard to Ragan's retaliation claim, he argued, "there is clear evidence of retaliation" because he called Edison's ethics and compliance department.  The ethics and compliance department then contacted Valenzuela, so he was aware of Ragan's complaints at the time of Ragan's termination.  As to the interference claim, Ragan argued he only needed to show interference—not a wrongful intent.  Ragan asserted he had proven Edison interfered with his employment at Pouk & Steinle.

13

Edison argued it did not have to be correct that Plaintiffs violated the safety rules. Rather, Edison only needed to show it took disciplinary action based on the "legitimate good faith belief the misconduct or charged activity occurred." Edison asserted there was nothing connecting Ragan's ethics complaints to Ragan's termination, and nothing indicating exactly what Santiago and Valenzuela knew about the ethics complaints. Edison argued the investigation was "done fairly," and while it may not have been perfect, it was honest and done in good faith, without an ulterior motive. Further, Edison noted when senior management was presented with the disciplinary decisions (whether to confirm the decisions), they were not informed of the employee's identity—only the merits of the investigation were given to the senior management. The trial court took the matter under submission.

I.      JUDGMENT

The trial court granted Edison's motions for summary judgment as to Ragan and McDowell. The trial court concluded the breach of contract causes of action were preempted by federal labor law. In regard to Ragan's discrimination and wrongful termination claims, the trial court found (1) Edison terminated Ragan's employment for a legitimate reason; (2) a self-serving statement by Ragan that he did not commit any safety violations is not sufficient to raise a triable issue of material fact; and (3) Ragan offered only speculation that there was an environment of favoritism toward Latino employees. As to the interference cause of action, the trial court concluded Ragan failed to show Edison engaged in a wrongful act.

The trial court concluded McDowell's breach of contract claims were preempted by federal labor law. In regard to McDowell's wrongful demotion claim, the trial court found McDowell's case failed for the same reasons as Ragan's case.

## DISCUSSION

A.     <u>EVIDENCE</u>

At the outset, we address Plaintiffs' request for this court "to strike those portions of [Edison's] evidence contended to be inadmissible, for the reasons set forth therein." If the trial court "'has put in incorrect statements of evidence, or other matters bearing upon [the court's] rulings, or has omitted evidence or other matters claimed to be material, the evil is not remediable here.'" (*People v. Huggins* (2006) 38 Cal.4th 175, 258, citing *In re Dolbeer's Estate* (1905) 147 Cal. 359, 361.) "[T]his court has no authority to strike out any evidence . . . ." (*Huggins*, at p. 258.) Thus, we decline Plaintiffs' request for this court to strike Edison's evidence.

To the extent Plaintiffs are requesting this court review the trial court's rulings on Plaintiffs' evidentiary objections, as opposed to striking the evidence directly, we conclude Plaintiffs have forfeited such an argument by failing to provide legal analysis regarding the trial court's alleged errors and failing to cite legal authority. (*Los Angeles Unified Sch. Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 212 [failure to provide legal argument forfeits issue on appeal];[1] *People v. Stanley* (1995) 10 Cal.4th 764, 793 [if a

---

[1] At oral argument, Plaintiffs faulted this court's citation to *Los Angeles Unified Sch. Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 212, in our tentative opinion because it is a contract case. During oral argument, Plaintiffs asserted there could not

*[footnote continued on next page]*

15

point does not include legal analysis, the court may pass it as waived]; Cal. Rules of Court, rule 8.204(a)(1)(B) [support points with argument and legal authority].)

### B.     SUMMARY JUDGMENT

#### 1.     *CONTENTION*

Plaintiffs contend the trial court erred by granting Edison's motions for summary judgment, because Plaintiffs raised triable issues of fact related to their wrongful termination and wrongful demotion causes of action.  We disagree.

#### 2.     *SUMMARY JUDGMENT LAW*

"'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.]  The materiality of a disputed fact is measured by the pleadings . . . ." (*Conroy v. Regents of Univ. of Cal.* (2009) 45 Cal.4th 1244, 1250.)  """We review the trial court's [summary judgment] decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' [Citation.]" (*Id.* at pp. 1249-1250.)

---

*[footnote continued from previous page]*
be forfeiture because this court is required to perform a de novo review of evidentiary issues.  The standard of review is not the relevant consideration here.  The issue is forfeited because Plaintiffs' opening brief does not include any legal analysis for this possible alternate argument concerning reviewing the objections.  The brief only contains a request for the evidence to be stricken without any legal explanation.

16

### 3.    *MCDONNELL DOUGLAS*[2] *TEST*

"'California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of [employment] discrimination . . . .' [Citation.]  [¶]  'This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.  Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159 (*Wills*).)

"In the first stage, the plaintiff bears the burden to establish a prima facie case of discrimination.  [Citation.]  The burden in this stage is '"not onerous"' [citation], and the evidence necessary to satisfy it is minimal [citation]." (*Wills*, *supra*, 195 Cal.App.4th at p. 159.)  "If the plaintiff meets this burden, ""the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision . . . .' . . ." [Citation.]  This likewise is not an onerous burden [citation], and is generally met by presenting admissible evidence showing the defendant's reason for its employment decision [citation]." (*Id.* at p. 160.)

"Finally, if the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her.  [Citation.]  The plaintiff may

---

**2** *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination. [Citation.]" (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

"A defendant's summary judgment motion 'slightly modifies the order of these [*McDonnell Douglas* factors].' [Citation.] Consequently, [Edison] had the initial burden to either (1) negate an essential element of [Plaintiffs'] prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for terminating [or demoting Plaintiffs] [citation]." (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

"'[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.] [¶] 'As several federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] . . .'" [Citation.]" (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

### 4. *LEGITIMATE REASON*

To establish a legitimate reason for disciplinary action, the employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the [termination or demotion]. The explanation provided must be legally sufficient to

justify a judgment for the [employer]." (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 149 (*Sada*).)

We begin with Ragan's termination. The record includes memoranda from Edison to Ragan admonishing Ragan for various safety violations and warning him that future violations could lead to more severe disciplinary actions. The memoranda are dated August 11, 2005; August 24, 2005; and July 27, 2006. The record also includes Valenzuela's deposition testimony, which reflects Ragan was terminated because he was not meeting Edison's safety standards. Further, the record includes the investigative report related to the Chino Hills incident. A portion of the report specifically concerns Ragan. The report reflects Ragan suffered four suspensions over a four and a half-year period.[3] The Chino Hills incident was the fifth incident in that time

---

[3] At oral argument, Plaintiffs argued that the "four suspensions" fact is incorrect. Plaintiffs asserted this court incorrectly relied on a document reflecting Ragan suffered four suspensions, but during Fernando Valenzuela's deposition he corrected that typographical error: Valenzuela stated that instead of "four" the document he was reading at the deposition should have reflected the word "your." During Valenzuela's deposition he was reading "Exhibit 6" and was asked, "Do you know . . . whether or not Mr. Ragan was severely disciplined for four violations of corporate safety operating policy within a year or less of October 31, 2006?" Valenzuela responded, "That is incorrect. That's a typo in paragraph ten. Instead of four, it should be your." The Appellant's Appendix is missing pages 113 through 117 of the deposition where the document comprising Exhibit 6 would have been identified. There is not a list of exhibits included in the front or back of Valenzuela's deposition transcript. The exhibits included in the Appellant's Appendix in the general vicinity of Valenzuela's deposition transcript jump from No. 5 to No. 7. Thus, it is unclear what document comprised Exhibit 6. However, contrary to Plaintiffs' oral argument, Valenzuela's testimony is not particularly relevant to the "four suspension" issue.

The "four suspensions" fact cited in this court's opinion is derived from a report listing each of the individual four suspensions—not from a document with a single line reading "four suspensions" that could contain the typographical error discussed during

*[footnote continued on next page]*

period.  Interrogatory responses reflect various supervisors approved of the decision to terminate Ragan.

Given the foregoing evidence, a trier of fact could find Edison terminated Ragan's employment because he repeatedly disregarded Edison's policies related to safety and conduct.  The evidence in the record is thorough and consistent as to Edison's reasons for firing Ragan.  Thus, Edison has established a legitimate and nondiscriminatory basis for terminating Ragan's employment.

Next, we turn to the evidence related to McDowell.  A letter from Edison to McDowell dated July 17, 2006, reflects McDowell violated safety rules on May 19, 2006, and on July 19, 2005.  The letter warned McDowell that future violations could result in demotion or termination.  A letter to McDowell concerning his demotion provides, "The reason for this demotion is your poor job performance and violation of the Accident Prevention Manual safety rules P20, 309b, 141b, 306c, P17, 306d, 143b, P11a."

---

*[footnote continued from previous page]*

Valenzuela's deposition.  The report cited by this court is marked as Exhibit No. 10 for the deposition of Norman Santiago.  Thus, to the extent there is an error with the words "four" and "your" in an unidentified document, that is not pertinent, because there is a document in the record, reflecting (1) one incident in March 2002; (2) a second incident on July 19, 2005; (3) a third incident on July 16, 2006; and (4) a fourth incident on October 31, 2006.  This report in the record then notes, "In the last four and a half years, this employee has had five incidents that demonstrate poor judgment and disregard for safety, and company policies," i.e. the four prior incidents and the current incident. Thus, to the extent there is a document that should read "your" instead of "four," that is not the document this court is relying upon in citing the "four suspensions" fact.

Santiago's deposition testimony reflects McDowell was demoted due to his history of being disciplined, combined with the Chino Hills incident. Valenzuela's deposition testimony reflects McDowell was demoted "for continual violation of the safety rules taking the [Chino Hills] incident and prior incidents into consideration."

The investigative report related to the Chino Hills incident reflects McDowell suffered a suspension in 2005 and a second suspension in 2006. The Chino Hills incident was McDowell's third violation in a two-year period. Given the repeated and consistent reasoning for Edison's decision to demote McDowell, we conclude Edison had established it had a legitimate reason for demoting McDowell—his failure to comply with Edison's safety standards.

### 5. *PRETEXTUAL REASON*

Plaintiffs assert Edison's "justification[s] for the adverse employment actions are unworthy of credence." Plaintiffs contend the investigative report concerning the Chino Hills incident was "'skewed' to favor the foregone conclusions" of people at Edison "looking to harm Ragan." In support of this theory, Plaintiffs cite Edison's Ethics and Compliance Department's conclusion that Ragan violated safety rules during the Chino Hills incident; the conclusion was made prior to the release of the safety committee's investigative report. The document cited by Plaintiffs is the Ethics Department's case report related to the Chino Hills incident. In the ethics report, the Ethics Department concluded, "This does not appear to be an ethics issue . . . ." The report further provides, "This issue is prompted by a safety rule violation by Mr. Ragan on November 17. The issue is currently being investigated by the district safety team and local

21

management per normal procedures." A plain reading of the report does not reflect a "foregone conclusion" by the investigative committee. Rather, it reflects an ethics report was generated due to an alleged safety rule violation that was being investigated. Accordingly, we find Plaintiffs' reliance on the ethics report to be unpersuasive.

The next item of proof Plaintiffs offer to support their theory the investigative report was skewed to favor the conclusions of people wanting to harm Ragan is: "The mysterious appearance of Cervantes at the Ontario District yard to lead investigator Athearn over to the subject Burd switch in that yard, even though Cervantes was not 'part' of the investigation." This court cannot decipher Plaintiffs' sentence. It appears Plaintiffs are alleging a conspiracy because Cervantes, who is a supervisor at Edison, suggested Athearn, who is a safety specialist at Edison, look at a BURD switch. Cervantes testified Athearn's request for him to look at the BURD switch "seemed pretty normal." Thus, it is unclear exactly how Cervantes asking Athearn to look at the switch is proof the investigative report was "rigged," assuming that is the point Plaintiffs were attempting to make.

The third item of proof Plaintiffs offer to establish that the investigative report is a sham is "Athearn's admission that Cervantes became 'part of the investigative team.'" Athearn explained that Cervantes was able to join the investigative team "[a]ny time he chooses to. He's a management supervisor of the crews. He can question [them] when he feels the need to see what the work practices are." Athearn stated any supervisor could contribute to the investigation, even if the supervisor was not an official part of the investigative team. Given Athearn's testimony, it is unclear how Cervantes's

participation in the investigation would be suspicious, since supervisors were permitted to make contributions to the investigation. Thus, we find Plaintiffs' argument to be unpersuasive.

A fourth item Plaintiffs offer to prove the investigative report is a façade is the recommendation in the report that Ragan be terminated, which Plaintiffs assert was made prior to the conclusion of the investigation. The citation provided by Plaintiffs is to the transcript of Santiago's deposition. During Santiago's deposition he was asked why "Exhibit 11" reflected Ragan was under investigation, but also recommended he be terminated. Exhibit 11 is a report about the Chino Hills incident, which also includes Ragan's record of discipline. Santiago said he could not say why the report reflected a current investigation and recommended Ragan's termination.

Exhibit 11 is a report reflecting Edison's investigative committee had twice interviewed the crew members involved in the Chino Hills incident, and carefully reviewed the inconsistencies in the crew members' statements. The report provides the committee's conclusion that McDowell and Ragan violated an Edison safety procedure by improperly connecting the grounding perches to the structure ground. In other words, they were "working on de-energized cables without proper grounding." A portion of the report gives a chronological history of Ragan's discipline incidents. The different incidents are titled by date, e.g. "July 19, 2005," then a short description of the incident and discipline is provided. At the end of the list is the most recent Chino Hills incident. The title for the Chino Hills incident is "Current investigation for actions on November 16, 2006."

23

Rather than reflecting Ragan was still under investigation, a plain reading of the document reflects the "current investigation" title was meant to inform the reader that the November 16, 2006, incident was not one for which Ragan had already been disciplined—it was the incident that was the subject of the report. A plain reading of the report reflects the committee had concluded its investigation and was submitting its final report recommending Ragan's termination. Thus it does not appear termination was recommended prior to the conclusion of the investigation. As a result, we find Plaintiffs' reliance on Santiago's testimony related to Exhibit 11 to be unpersuasive.

Fifth, Plaintiffs cite to evidence that Santiago said he did not want to terminate Ragan or demote McDowell, but that his "'hands were tied.'" Plaintiffs' reliance on this statement is not persuasive because it was explained that Santiago did not want to take part in the investigation because Santiago and McDowell "had been friends for a lot of years." The statement does not reflect Santiago's belief that the discipline was undeserved. Rather, it appears to reflect a sadness that long-term Edison employees, including a friend, needed to be disciplined. Santiago's hands could have "been tied" because Ragan and McDowell did make safety errors, not because there was a conspiracy against Plaintiffs. In sum, Santiago's hearsay statement does not reflect that Edison's reasoning was pretextual.

Sixth, Plaintiffs cite to Cervantes's admission that the replacement foreman at the Chino Hills incident also violated safety rules but was not disciplined. Contrary to Plaintiffs' position, Cervantes's testimony reflects the replacement foreman was disciplined for committing a safety violation; he was "orally reprimanded." Cervantes

24

told the replacement foreman if he made the same error again then there would be "severe consequences." Cervantes recorded the oral reprimand in his personal journal and discussed it at a staff meeting with other supervisors. It is unclear whether the replacement foreman had a history of safety violations, or if this was the first time he was disciplined. Accordingly, we are not persuaded by Plaintiffs' reliance on this evidence, because Plaintiffs had received less severe discipline themselves, such as suspensions, for prior safety violations.

Seventh, Plaintiffs assert Edison's reasoning is pretextual because the standing safety committee did not conduct the investigation into the Chino Hills incident. It is unclear why Plaintiffs find this problematic, as it appears the committee investigating the Chino Hills incident was headed by a longtime friend of McDowell, Santiago, who stated he had no desire to be involved in disciplining the two men. In Plaintiffs' reply brief they assert it is obvious that not using the standing safety committee shows Edison did not have a legitimate reason for disciplining Plaintiffs. We do not agree that it is obvious. Since the investigative committee was headed by McDowell's longtime friend, there does not appear to be an invidious purpose for not using the standing committee.

In sum, Plaintiffs have not shown Edison's report was skewed and have not established a possibility that Edison lacked a legitimate reason for the disciplinary action. Plaintiffs have failed to provide substantial evidence establishing Edison's stated nondiscriminatory reason for the adverse action was untrue or pretextual. As a result, we conclude the trial court did not err by granting summary judgment.

Relying on *Sada*, *supra*, 56 Cal.App.4th 138, Plaintiffs assert their declarations denying having committed safety violations should be sufficient to defeat Edison's summary judgment motion. In *Sada*, the appellate court found the employer's evidence was "general and sometimes conclusory." (*Id.* at p. 153.) As a result, the appellate court could not conclude the employer had a legitimate reason for not hiring the plaintiff. (*Id.* at pp. 153-154.)

Further, the *Sada* record included evidence of (1) a supervisor making derogatory comments about Hispanic people to the plaintiff and an employee, and (2) unfavorable statements by the supervisor, made during the plaintiff's interview, concerning the plaintiff's Mexican heritage. (*Sada*, *supra*, 56 Cal.App.4th at p. 145.) The record also included evidence of the supervisor lying to the plaintiff about available job openings— telling the plaintiff there were not openings when there were openings. (*Id.* at p. 146.) The appellate court concluded the plaintiff "presented sufficient evidence to raise a triable issue as to pretext," because the evidence permitted an inference that the employer did not consider the merits of the plaintiff's job application, and instead made a hiring decision based upon the plaintiff's national origin and ancestry. (*Id.* at p. 154.) Thus, the appellate court concluded the employer did not establish a legitimate reason for declining to hire the plaintiff, but the plaintiff established a possible discriminatory reason for the hiring decision. (*Id.* at pp. 154-155.)

First, it is important to note, the *Sada* plaintiff appears to have established her case by relying on a different prong of the test than Plaintiffs in the instant case. The *Sada* plaintiff showed the employment decision was likely motivated by a

26

discriminatory intent, while Plaintiffs in this case have tried to establish Edison's stated reasons for its adverse actions were not credible. So, we are addressing different prongs of the test, which is not ideal. (See *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 614 [setting forth the two different prongs].) Nevertheless we will address Plaintiffs' *Sada* argument.

Plaintiffs' reliance on *Sada* is not persuasive because in the instant case Plaintiffs are relying on their statements that they did not violate the safety rules. The flaw in this argument is that good cause for termination is a fair and honest reason, regulated by good faith on the part of the exercising party, as opposed to a trivial reason or a pretextual reason. (*Nelson v. United Technologies*, *supra*, 74 Cal.App.4th at p. 616.) If Plaintiffs are correct that they did not commit safety violations during the Chino Hills incident, the evidence still reflects Edison's belief Plaintiffs did violate the safety standards, even if it is a mistaken belief. In other words, the evidence reflects Edison believes Plaintiffs violated the safety rules; the evidence is replete with Edison's conclusion that Plaintiffs did not follow the proper safety protocols.

Thus, the record does not indicate Plaintiffs were disciplined for an improper reason. At most it indicates Edison made a mistake, but FEHA does not protect employees from mistakes, it protects employees from discrimination. (See *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 388-389 [proving the employer made a mistake is not sufficient, a plaintiff must show the employer did not act for the claimed nondiscriminatory reason]; see also *Wills*, *supra*, 195 Cal.App.4th at p. 160 ["The [employee] cannot simply show that the employer's

27

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"].)  In sum, the trial court did not err by concluding Plaintiffs failed to raise a triable issue of material fact.

## DISPOSITION

The judgment is affirmed.  Respondent, Southern California Edison Company, is awarded its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                                        
                                                           J.


We concur:


HOLLENHORST                          
                    Acting P. J.


KING                                           
                                    J.


28