Filed 2/11/16  Gordon v. City of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAMES GORDON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B256995<br><br>(Los Angeles County<br>Super. Ct. No. BC 491800) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard L. Fruin, Jr., Judge.  Reversed.

Law Offices of Gregory W. Smith, Gregory W. Smith; Christopher Brizzolara; Benedon & Serlin, Douglas G. Benedon and Kelly R. Horwitz for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, Philip Reznik and Christine T. Heoffner for Defendant and Respondent.

_____

Los Angeles Police Department (LAPD) Sergeant II James Gordon sued the City of Los Angeles (City) for alleged adverse employment action in retaliation for his assistance with a California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) action filed by an LAPD detective. The trial court granted City's motion for summary judgment, and Gordon timely appealed. We conclude triable issues of material fact exist with respect to both grounds upon which the trial court granted summary judgment and reverse, without prejudice to future motions.

## BACKGROUND

### 1. Allegations of the operative complaint

Gordon's complaint, filed September 10, 2012, alleges that in late 2010 he was appointed to the positions of Acting Commander's Aide for Commander Blake Chow and Acting Officer in Charge (OIC) of the Counter-Terrorism/Special Operations Bureau (CTSOB) Liaison Section. The latter position had been held by Detective Mike Kozak and became vacant when he went on military leave. Chow was one of the commanding officers of the CTSOB.

The complaint alleges that around February of 2011, Chow directed Gordon "to locate a supervisor from one of the five LAPD Division Commands that had the necessary skills to serve as the OIC of the CTSOB." Based upon his research, Gordon recommended Detective II Dan Garcia for the position. At Chow's request, Garcia was notified and an interview with Chow was scheduled. Chow thereafter ordered Gordon to cancel the interview and find someone else to fill the position. Chow would not explain his reasons to Gordon and told Gordon to speak to Deputy Chief Michael Downing, who told Gordon they were not going to select Garcia.

The complaint further alleges that, as part of his duties as Acting Commander's Aide, Gordon subsequently reviewed an adjudicated personnel complaint investigation in which Garcia complained of discrimination and retaliation in violation of FEHA by command staff and several supervisors at the Major Crimes Division (MCD). Gordon "was and is aware that when an employee files such actions against LAPD command

2

staff or supervisors," command staff retaliates. He therefore "believed that Chow and Downing made their decision not to select Garcia for the position as the OIC of the CTSOB Liaison Section as a result of Garcia having filed such complaint(s) against MCD command and supervisors." Gordon informed Garcia of his belief, and Garcia told Gordon he was pursuing legal action against City for retaliation and discrimination. Thereafter, Gordon "was identified as a witness in, interviewed by Defendants in connection with, and otherwise participated in the prosecution of" Garcia's action against City, including preparing a declaration in support of Garcia on or about August 6, 2011.

The complaint alleges that on August 16, 2011, Chow angrily confronted Gordon about speaking to Garcia and said "'now Garcia was suing'" Chow. Soon thereafter, the deputy city attorney who prepared a summary judgment motion against Garcia phoned Gordon and asked to meet with him "to discuss matters regarding Garcia." Soon thereafter, Gordon was summoned for drug testing, and when he returned, he discovered he had been "removed from Chow's proxy and locked out of Chow's calendar and email." On August 17, 2011, Chow and another officer interviewed Gordon and other candidates to fill the OIC position. Chow was curt and, "in violation of LAPD policies, practices, and procedures," asked Gordon about a 13-year-old complaint, even though "Chow was already well aware of the facts, events, and circumstances surrounding the complaint" because he had been one of Gordon's watch commanders. Gordon was not selected for the position even though he was the most qualified applicant. Chow also removed Gordon as his aide, saying Gordon could not be trusted because of his involvement with Garcia.

The complaint alleges that thereafter Gordon was stripped of his supervisory duties; he was assigned to answer telephones, perform menial tasks, and write documents; and he was ostracized by LAPD command staff and excluded from CTSOB operational issues and matters. He was subsequently moved to the Major Crimes Analysis section, where he conducted assessments at LAX that would normally be assigned to an officer of lower rank.

3

The complaint alleges the retaliatory conduct caused Gordon to lose income, will hinder him from being promoted in rank or assigned to "coveted positions," and will impair his future earnings.

## 2. The City's summary judgment motion

City filed a motion for summary judgment or, alternatively, summary adjudication of issues. City set forth four theories regarding summary judgment: Gordon did not engage in protected activity, he was not subjected to any adverse employment action, he cannot establish a causal connection between his preparation of a declaration for Garcia and any cognizable adverse employment action, and City had legitimate, nonretaliatory reasons for the employment actions of which Gordon complains.[1]

The trial court granted summary judgment for City on the grounds (1) Gordon did not suffer any adverse employment action and (2) City established a nonretaliatory, legitimate reason for not selecting Gordon for the OIC position and Gordon failed to provide substantial evidence that City's reason was a pretext for retaliation. With respect to the first ground, the trial court stated that Gordon had not alleged or provided evidence that his removal from being Chow's aide caused him any economic loss or resulted in a change in his rank, pay grade, benefits, or promotional opportunities. The court then reasoned that because Gordon's removal as aide was not actionable, it provided no "secondary support" for his claim that not selecting him as OIC was retaliatory. With respect to the second ground, the court cited Downing's testimony that he selected Sergeant II Mike Seguin for the OIC position because he knew him, liked his background in community outreach, and thought he was a good fit, whereas Downing had a concern about Gordon. The court rejected Gordon's argument that Chow's involvement in the interviews and in reporting results of the interviews to Downing tainted the process, although the court accepted that Chow "had issues with Gordon."

---

[1] City's "issues" for summary adjudication were (1) City was entitled to summary judgment and (2) Gordon failed to exhaust administrative remedies with respect to events subsequent to September 16, 2011.

4

**DISCUSSION**

**1.      Principles regarding summary judgment motions**

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  A triable issue of material fact exists if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion." (*Ibid.*)  The moving party also bears the initial burden of producing evidence "to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Ibid.*)

A defendant moving for summary judgment must show, with respect to each of plaintiff's causes of action, that either one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Upon such a showing, the burden shifts to the plaintiff to prove the existence of a triable issue of material fact regarding the element or defense addressed by the defendant's motion.  (*Ibid.*)

We review a trial court's grant of summary judgment de novo.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.)  We view all of the evidence in a light favorable to the responding party, liberally construing the responding party's evidence while strictly scrutinizing the moving party's showing, and resolving any doubts or ambiguities in favor of the responding party.  (*Id.* at p. 768.)  Neither we nor the trial court may weigh the plaintiff's evidence or inferences against the defendant's as the trier of fact would at a trial.  (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540 (*Reid*).)  "[T]he facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 (*Sada*).)  "The court seeks to find contradictions in the evidence, or inferences reasonably deducible from the evidence, which raise a triable issue of material fact." (*Johnson v. United Cerebral Palsy/Spastic Children's*

*Foundation* (2009) 173 Cal.App.4th 740, 754.) "[D]oubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party." (*Ibid.*)

Evidentiary objections made by the parties—either at the hearing on the summary judgment motion or in writing before the hearing—are preserved on appeal, even if the trial court neglects its duty to rule upon them. (*Reid*, *supra*, 50 Cal.4th at pp. 531–532.)

**2.      Principles regarding proof of unlawful employment retaliation**

It is an unlawful business practice for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part," e.g., a proceeding before the Department of Fair Employment and Housing or a civil action alleging a violation of the FEHA. (Gov. Code, § 12940, subd. (h).)

At trial, a plaintiff asserting a retaliation claim under the FEHA must first establish a prima facie case by showing "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) "[A]n employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA." (*Id.* at p. 1043.)

An adverse employment action is one that materially affects the terms, conditions, or privileges of employment. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1052.) FEHA not only protects against "ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement . . . ." (*Id.* at p. 1054.) "[T]he determination of whether a particular action or course of conduct

6

rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Id*. at p. 1052.) Such a determination "is not, by its nature, susceptible to a mathematically precise test." (*Id*. at p. 1054.) The "'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Ibid.*) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [Government Code section 12940, subdivisions (a) and (h)]." (*Id*. at pp. 1054–1055.) Actionable retaliation need not be carried out in "one swift blow," but rather may be "a series of subtle, yet damaging, injuries." (*Id*. at p. 1055.) Thus, each alleged retaliatory act need not constitute an adverse employment action in and of itself, and the totality of the circumstances must be considered. (*Id*. at pp. 1036, 1055–1056.)

The causal link between protected activity and the employer's action may be established by inference from circumstantial evidence, such as the temporal proximity of the adverse employment action and the employer's discovery of the employee's protected activity. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.)

If the employee makes this prima facie showing, a presumption of retaliation arises. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) The employer must then introduce evidence it acted for a legitimate, nonretaliatory reason. (*Ibid.*; *Sada*, *supra*, 56 Cal.App.4th at p. 149.) If the employer does so, the presumption of retaliation "'"'drops out of the picture'"'" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042), and the question is "whether the [employee] has shown, or can show, that the challenged action resulted in

7

fact from [retaliatory] animus rather than other causes" (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 112 (*Reeves*)).

The employee, who retains the burden of persuasion, then has "'"'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination.  [The employee] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"'" (*Sada*, *supra*, 56 Cal.App.4th at p. 150.)  The employee cannot "'"'simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee '"must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [. . . asserted] non-discriminatory reasons.'"'"'" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)  "'Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.'" (*Sada*, at p. 156.)

When the employer files a motion for summary judgment in a retaliation case, however, the burdens are reversed and the employer bears the burden of "'present[ing] admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors.'" (*Sada*, *supra*, 56 Cal.App.4th at p. 150.)  If the employer succeeds in doing so, it "'will be entitled to summary judgment *unless the* [*employee*] *produces admissible evidence which raises a triable issue of fact material to the* [*employer's*] *showing*.  In short, . . . "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury."'" (*Ibid.*, original italics.)

8

"'The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus. The employer's mere articulation of a legitimate reason for the action cannot answer this question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor. Thus, citing a legitimate reason for the challenged action will entitle the employer to summary judgment only when the employee's showing, while sufficient to invoke the presumption, is *too weak* to sustain a reasoned inference in the employee's favor.'" (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 755.) "Proof of discriminatory intent often depends on inferences rather than direct evidence. [Citation.] And because it does, 'very little evidence of such intent is necessary to defeat summary judgment.' [Citation.] Put conversely, summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283 (*Nazir*).)

### 3.    Triable issues of material fact exist

Based upon our de novo review of the record, especially the parties' separate statements, including City's reply separate statement[2] to which Gordon did not object,

---

[2] Filing a reply separate statement citing new evidence not filed or cited in the moving party's original separate statement is unauthorized and raises significant due process concerns. (*Nazir*, *supra*, 178 Cal.App.4th at p. 252; *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316.) Gordon did not object to City's filing of a reply separate statement or submission of new evidence, however, except he objected to Downing's declaration, which was not filed with City's summary judgment motion and not cited in City's separate statement. It was filed about 12 days after the motion for summary judgment and its supporting papers, less than the statutorily mandated 75 days before the designated March 14, 2014 hearing date, and, most important, cited only in the *reply* separate statement as *additional* support for several of City's purported undisputed facts. We agree that declaration should not be considered. City should have filed and served it with the motion and supporting papers and cited it in its separate statement to provide Gordon with notice that City was relying upon it in support of several purportedly undisputed facts. City's course of conduct was contrary to

9

and the evidence cited in those separate statements, we conclude there are triable issues of material fact that preclude granting summary judgment. Many of City's assertions of facts that it considers material are not actually supported by the evidence cited by City, and Gordon presented evidence raising a dispute as to many of City's material facts. In addition, Gordon's additional material facts, most of which City either expressly agreed were undisputed, failed to address, or failed to cite any evidence supporting its claim to dispute, create triable issues. Given the large number of facts (138), we do not address all of the disputed or unsupported facts, but only those most significant to resolution of this appeal.

### a. City's claim of legitimate, nonretaliatory reasons

#### (1) The Acting Aide position and purported concerns about Gordon

A key aspect of City's claim it had legitimate, nonretaliatory reasons for its actions with respect to Gordon was that Gordon was only temporarily placed as Acting OIC and Acting Aide to Chow because James Featherstone, a manager of the multi-agency Los Angeles Operational Area Critical Incident Planning and Training Alliance (Alliance), to which Gordon had been assigned since 2008, complained to Downing that Gordon had "become disruptive" and asked Downing to remove Gordon from the Alliance. However, Gordon's deposition, which is the only evidence City cites in support of this assertion, does not support it. Gordon testified that Downing told Gordon that Gordon would be reassigned because Featherstone "personally" "had a problem" with Gordon.

In addition, the evidence cited by City does not support the assertion that Gordon was assigned as Chow's aide only temporarily to allow Chow to determine if he would be "a good fit." City cites the complaint and Gordon's deposition, both of which state Gordon was assigned to be Chow's aide, and paragraph 4 of Chow's declaration, which states, "Gordon was going to be loaned to CTSOB and would serve as my Commander's Aide." A paragraph of Chow's declaration not cited by City states Chow told Gordon

_____

Code of Civil Procedure section 437c, subdivisions (a) and (b)(1) and California Rules of Court, rule 3.1350(c)(4) and (d). It also raises significant due process concerns.

10

"he was being temporarily loaned to CTSOB to act as my Aide." Chow does not state the assignment was temporary to allow him to assess whether Gordon was a "good fit." Gordon's declaration states Chow told him "he was unable to fill the position officially due to hiring restrictions" and Chow testified at his deposition that as a result of a "bureaucratic snafu," the personnel division had not authorized him to have an aide position and he had to work with that division to obtain authority to open the position, although he also testified "it had been open for a couple years." Thus, City has not established as undisputed facts that Gordon's assignment as Chow's aide was meant from the outset to be temporary or that Gordon had been disruptive in his prior assignment.

Another key aspect of City's claim of legitimate nonretaliatory reasons with respect to removal of Gordon as Chow's aide is Chow's "significant concerns" about Gordon's "judgment and interactions with other employees" and his purported passive resistance to performing assignments. However, the purportedly undisputed facts City set forth in its separate statement to support this theory are all either disputed or not supported by admissible evidence.

First, Gordon established a dispute with respect to City's assertions that (1) "Chow had significant concerns" about Gordon's "judgment and interactions with other employees," (2) Chow believed Gordon was passively resisting performing assignments, and (3) Chow "did not feel confident that [Gordon] was accurately conveying information to subordinate commands." Gordon did so by citing and presenting two highly laudatory performance reviews by Chow, the first for the period of May 20, 2010 to May 19, 2011, and the second for May 20, 2011 to May 19, 2012. Neither reflects any such concerns about Gordon's judgment or conduct and both tend to demonstrate Chow had no such concerns. Each review apparently utilized a standard preprinted LAPD form with various descriptors pertaining to specified categories of conduct or performance. The form used for the earlier of the two performance reviews has three ratings for each category: greatly exceeds standards, meets or sometimes exceeds standards, and needs improvement. The form used in the later review has only two ratings: meets or exceeds

11

standards and needs improvement. Chow did not mark any aspect of Gordon's performance or conduct as needing improvement in either review.

Indeed, in the earlier of the two reviews, Chow rated Gordon as greatly exceeding standards in numerous categories, including many that would seem to pertain directly to the asserted deficiencies upon which City relies, for example: "Produces the work deemed most important by employee's commanding officer; and does so in a quantity greatly exceeding all but the most productive peers"; "Written products are always on time, and are consistently of such superior quality that most could be used as Department exemplars"; "Characterized by management as typically assuming responsibility in a broad range of situations where such responsibility was extraordinary, and where the employee consistently acted ethically and productively"; and "Speaks clearly, concisely, and tactfully to advance Department interests while applying exceptional active listening to engage listener's ideas." Chow marked Gordon as meeting or sometimes exceeding standards for the category "Exhibits initiative to resolve problems or take on tasks deemed important by employee's supervisor or commanding officer."

Similarly, in the second review, Chow also marked that Gordon met or exceeded standards with respect to the following categories pertinent to Chow's assertions of dissatisfaction with Gordon: "Produces work deemed important by employee's supervisor or commanding officer in a quantity which meets or exceeds explicit supervisory or command expectations"; "Exhibits initiative to . . . take on tasks deemed important by employee's supervisor or commanding officer"; "Written work is always or nearly always submitted on time"; and "Typically completed required assignments, tasks, and other clear job requirements." City argues on appeal that Chow was not required to write "every shortfall" or concern in his evaluations of Gordon, but this argument was not set forth in the separate statement or supported by any cited evidence. The two performance reviews are more than sufficient to create a dispute with respect to City's asserted facts regarding Chow's purported dissatisfaction with Gordon.

12

In addition, when asked at his deposition about Gordon's purported passive resistance, Chow identified only two instances: formation of a cricket league and production of a CTSOB goals poster. However, Gordon presented Downing's testimony at deposition that lack of a budget, a playing field, and other resources prevented the formation of the cricket league, and Downing thought the goals poster was completed in a timely fashion. In addition, we note that the first performance review includes, under the category of "the employee's most significant contribution to the Unit or Division and the Department during this assessment period," "the development of a youth cricket team." Thus, while Gordon may not have succeeded in forming a *league*, he apparently formed a *team*, and Chow praised him for this in the performance review. Moreover, Chow's conclusion that Gordon was passively resisting performing assignments is inherently speculative regarding Gordon's mental state, and Gordon's objection to the pertinent portion of Chow's declaration as speculative should have been sustained by the trial court.

City also attempted to support Chow's "significant concerns" about Gordon by relying upon an assertion that Featherstone and Captain Horace Frank complained to Chow that Gordon "claimed personal ownership of presentations he had prepared" and "delayed and resisted turning [them] over to managers when asked." The evidence cited by City is Chow's declaration, which identifies a single presentation regarding an earthquake in Chile that was the subject of one call to Chow by Featherstone and another by Frank. Thus, City's factual assertion exaggerates the extent of the alleged misconduct by referring to "presentations." In any event, Gordon's declaration created at least a partial dispute with respect to this asserted fact. Gordon declared that upon request he provided Frank with the presentation. He further declared he "had given the presentation to Featherstone on several occasions," but it is unclear whether this means he turned it over to Featherstone or that Featherstone was in the audience when Gordon gave the presentation. City has not addressed this inherent ambiguity. Because we must view the

13

evidence in a light favorable to Gordon and liberally construe his evidence, we conclude Gordon successfully disputed City's factual assertion.

Yet another factual assertion urged by City in support of Chow's "significant concerns" about Gordon is Chow's concern about Gordon's "behavior towards other staff members, including Chow's secretary." This assertion is, at best, only partially supported by Chow's declaration, the only evidence City cites. Chow declared, "Some of my other staff members were also not comfortable with Gordon, including my secretary, Rosa Ortega, who complained to me about an inappropriate angry outburst by Gordon." Nothing indicates any discomfort about Gordon felt by any staff members, including Ortega, was based upon Gordon's behavior *toward* those persons. Chow did not even declare that Gordon directed his inappropriate angry outburst at Ortega. Notably, one of Gordon's additional material facts, supported by his declaration and undisputed by City, established he worked in a cubicle directly outside Chow's office, and we may infer Gordon's conversations with others, including Gordon's side of telephone conversations, were audible to others in the vicinity.

A related key aspect of City's claim of legitimate nonretaliatory reasons with respect to the aide position is that "[t]he Aide changes were decided in July, **before** Downing or Chow had any knowledge of Gordon's so-called 'protected activity.'" (Original boldface & italics.) City's separate statement addresses this contention with two purportedly undisputed facts asserting that Chow and Downing "discussed changing [Gordon's] role as Chow's Aide" in "June or July of 2011, while [Gordon] was out on a medical leave" and "decided to take [Gordon] out of the day to day operation of CTSOB and have him focus instead on individual projects and programs . . . . This change of focus did not involve any changes in [Gordon's] . . . assignment title (Commander's Aide) . . . ." City cited as support only Chow's declaration, which states: "In or about June or July of 2011, while Gordon was out on a medical leave, I discussed my concerns about Gordon with Chief Downing. We agreed that Gordon should be gradually transitioned out of involvement in the day to day operations of CTSOB as my

14

Commander's Aide and into a role focused on individual special projects. This had to be a gradual transition because I did not have anyone else to perform the Commander's Aide duties. This change of focus did not involve any changes in Gordon's . . . assignment title (Commander's Aide) . . . ." Gordon objected to this paragraph of Chow's declaration on grounds including inadmissible hearsay. The trial court erred by failing to sustain this objection, and we will not consider Chow's declaration as establishing these factual assertions. Chow's declaration relates the content of his out-of-court conversation with Downing, and City attempts to use the content of this conversation to prove the truth of the matter asserted therein, i.e., Chow and Downing decided at the time of the conversation to remove Gordon from Commander's Aide duties. Moreover, both City's factual assertions and Chow's declaration assert, somewhat in contradiction of the point City is trying to make, that the course of action purportedly chosen by Chow and Downing did not change Gordon's "assignment title" of Commander's Aide.

### (2) The OIC position

With respect to City's claim of legitimate, nonretaliatory reasons for not selecting Gordon to fill the OIC position, City essentially relies on two theories: Downing was the sole decision maker and had no knowledge of Gordon's assistance to Garcia with his FEHA claim, and Gordon was not more qualified for the position than Seguin because Seguin had Community Relations Office (CRO) experience that Downing sought, while Gordon lacked such experience. With respect to the first theory, City failed to establish that Downing was unaware of Gordon's assistance to Garcia by the time he selected Seguin as OIC, which was either August 17 or 18. Downing's lack of such knowledge was not listed as a fact in City's separate statement. Chow's purported lack of knowledge that Gordon "*prepar[ed] a declaration* in connection with Garcia's lawsuit" (italics added) was an undisputed fact, but mere ignorance about a declaration is not equivalent to ignorance of all assistance. Gordon presented (and cited in his responsive separate statement) Chow's deposition testimony in which he admitted that he was aware in August of 2011 that he learned that Garcia had filed a retaliation complaint, and

15

sometime in the August 3 to August 12, 2011 time range he learned that Gordon had spoken to Garcia. City failed to assert Downing's lack of knowledge as an undisputed fact. This omission is fatal to City's theory that Downing acted without knowledge of Gordon's protected activity.

City's theory that Gordon was not more qualified for the position than Seguin also depended upon factual assertions that are either unsupported or disputed. First, City attempts to characterize the CTSOB Liaison Section as "a community relations section," but the portions of the complaint and Chow's declaration City cites do not support that characterization. In addition, Gordon's declaration squarely refutes that characterization. Another key aspect of this theory is City's assertion that Downing "from the outset . . . envisioned bringing in a Sergeant who had experience supervising a divisional Community Relations Office." City cites *Chow's* declaration in support of this assertion. Although Chow's declaration literally supports the fact, it is either hearsay or speculation by Chow regarding Downing's mental state. Gordon objected to this portion of Chow's declaration on grounds including hearsay and speculation, and the trial court erred by failing to sustain that objection. These facts are key to City's theory, and the dispute as to the former and failure of City to support the latter with admissible evidence defeat City's theory.

Other facts supporting City's theory are also either disputed or unsupported. For example, City asserts the mission of the Liaison Section is "to conduct outreach to under-represented, faith-based communities." The evidence City cites reflects that this is *part* of what the section does. Gordon disputed this fact, citing his own declaration, and set forth his own additional fact, which is supported by Kozak's declaration and is undisputed by City, that "The purpose and mission of the Liaison Section was and always has been to provide focused strategic counter-terrorism communications in support of the counter-terrorism goals of the LAPD by conducting outreach to underrepresented faith-based communities and diaspora communities." Gordon also set forth, as an additional fact that City does not dispute, that the Liaison Section is "not a community relations

16

office as would be found in a patrol division. It is the liaison arm of the LAPD's [CTSOB], whose mission is to prevent the radicalization for jihad of at risk groups, and the preparedness, training, and interface with those entities and/or groups who would fall victim to such attacks." Gordon further set forth a description of what his duties were when he served as Acting OIC, and City did not dispute his assertion: "maintaining deployment needs, continuing the Liaison Section mission in combating terrorism and countering violent extremism, multi-agency interaction (local, state and federal levels), developing public/private stakeholder partnerships, organizing and conducting meetings, and public speaking."

Gordon also asserts, as an additional fact, that the responsibilities of the Liaison Section OIC position "require the individual holding the position to have a strong multi-faceted background in counter-terrorism operations and programs (local, state and national strategies); extensive knowledge in countering violent extremism . . . ; specialized section/unit operations and supervision; extensive public speaking experience; public and private sector outreach; and experience and knowledge of the Terrorism Liaison Officer . . . program, the Suspicious Activity Reporting System . . . program, and training development and delivery." The declarations of Gordon and Kozak support this fact. City attempts to dispute this fact by citing (1) a portion of Downing's deposition in which he addressed Seguin's background, why it was not important to him that Seguin lacked counter-terrorism experience, and why the CTSOB performs "outreach" and (2) pages 150 to 152 of Downing's deposition, which are not in the appellate record and do not appear to have been contained in the moving, opposing, or reply papers. While a jury might choose to credit Downing's assessment of whether the position required counter-terrorism experience over that of Kozak and Gordon, there is clearly a dispute on this point sufficient to preclude summary judgment. Significantly, it is undisputed that Gordon has extensive counter-terrorism experience and liaison work in the counter-terrorism field, and Seguin had little or none. Thus, if the position requires counter-terrorism experience, Gordon was more qualified than Seguin. Moreover,

17

Gordon established without dispute that he had experience in "community and public/private outreach" and had "developed a Young Muslim Leaders Group."

### (3) Timing and other factors supporting an inference of retaliation

We further note that the timing and nature of several acts and events, together with identity of the decision makers and Gordon's highly favorable performance reviews, also serve to raise a triable issue of fact regarding whether City's purported nonretaliatory reasons and support Gordon's claim of retaliation. (*Sada*, *supra*, 56 Cal.App.4th at pp. 156–157.) It is undisputed that Gordon spoke to Garcia's attorney in July or August of 2011 and she used the information Gordon provided to amend Garcia's DFEH complaint on August 3, 2011. That amendment expressly refers to Garcia being denied a position as a supervisor in the CTSOB Liaison Section, even though highly recommended by Gordon as the only qualified officer. On August 12, 2011, Garcia's attorney moved to amend the complaint in Garcia's civil suit to allege that Chow asked Gordon to research and recommend the most qualified person to supervise the Liaison Section; Gordon recommended Garcia, but Chow said, "'no, not that guy.'" Garcia's attorney served Deputy City Attorney Kelly Crockett Gales with the proposed amended complaint on August 12, 2011. Chow admitted in his deposition that he was aware in August of 2011 that he learned that Garcia had filed a retaliation complaint and sometime in the August 3 to August 12, 2011 time range Chow had a conversation with Gales and assumed that Gordon had spoken to Garcia.

The following facts are also undisputed: Gordon returned to work on August 16, 2011, after being on medical leave. That day, Chow called Gordon "into his office and stated angrily, 'Have you spoken to the City Attorney yet?'" After Gordon inquired, Chow said, "'You told Garcia that I didn't select him for the Liaison OIC and now he's suing me and I have to meet with the City Attorney to clear it up.'" Soon thereafter, Gales phoned Gordon and asked to meet with him regarding Garcia. The same day, Gordon discovered he had been removed as a proxy from Chow's computerized calendar. The next day (August 17, 2011) Gordon interviewed for the OIC position, with Chow and

18

Captain William Sutton as the interviewers. Chow "still appeared upset [and] began the interview curtly." He also asked Gordon about a 13-year-old complaint. The next day (August 18, 2011) Chow told Gordon that he was not selected as OIC and he would no longer be Chow's aide. Chow also stated that Gordon "could no longer be trusted because of the Garcia incident." As of August 18, 2011, Chow removed Gordon from his duties as Acting Commander's Aide and Acting OIC.

Gordon also established a dispute with respect to City's assertion that Chow spoke to Gordon daily after that time, and City failed to cite evidence that actually supported its assertion that Chow was unaware Gordon felt ostracized.

b. **Adverse employment action**

With respect to its theory Gordon suffered no adverse employment action, City's theories are that Gordon's rank, pay, and benefits did not change, the new duties to which he was assigned were consistent with his rank and skills and were coveted assignments, and he cannot rely upon his claim of being ostracized because he failed to report it to management. City fails to explain the final point or offer any supporting authority, and Gordon created a dispute as to that theory by citing his declaration, in which he states he attempted to discuss with Chow being ostracized, but Chow did not want to talk to him. Gordon also established a dispute with respect to each of the remaining theories.

City attempted to establish that the change in Gordon's duties did not result in any change in Gordon's rank, pay, or benefits, but Gordon disputed City's factual assertion, citing his own declaration in which he stated he lost overtime compensation and a take-home car. Gordon also set forth his own factual assertion that as a result of the change of his duties beginning August 18, 2011, he lost overtime compensation and a "dispersal parked/take-home car." The City did not dispute this fact. This, alone, is sufficient to establish a triable issue of material fact. City argues the overtime and take-home car were solely attributable to the OIC position. Even if we were to overlook City's failure to make such a factual assertion in its separate statement and support it with admissible

19

evidence, Gordon's retaliation claim is based in part on his nonselection as OIC. Thus, the loss of overtime and a car are an adverse employment action at issue in this case.

City made no attempt to directly negate Gordon's allegation that City's actions impaired his promotion and future income opportunities. It instead asserted that two of the positions and projects to which he has been assigned since August 18, 2011, are "coveted." However, Gordon established a dispute with respect to the "coveted" character of each such assignment.

We decline to address theories of City's motion upon which the trial court did not rely. City expressly based each of its theories upon the same 71 purportedly undisputed material facts, many of which are disputed and unsupported by the cited evidence. Thus, according to City's own reasoning and representation, the disputed and unsupported facts are material to, and thus preclude summary judgment on the basis of, each theory. We note City was also not entitled to summary adjudication, as its first "issue" was its entitlement to summary judgment and its second "issue" merely addressed the scope of conduct for which Gordon might recover. Issues for adjudication must completely dispose of an entire cause of action, affirmative defense, claim for damages, or issue of duty, not merely winnow the scope of acts alleged within a cause of action. (Code Civ. Proc., § 437c, subd. (f)(1).)

## DISPOSITION

The judgment is reversed, without prejudice to future motions. Appellant Gordon is awarded his costs on appeal.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.